IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 98-30724


AMOCO PRODUCTION COMPANY

Plaintiff - Appellee-Cross-Appellant

versus

TEXAS MERIDIAN RESOURCES EXPLORATION INC;
ET AL

Defendants

MERIDIAN RESOURCE & EXPLORATION, CO,
formerly known as Texas Meridian Resources
Exploration Inc.

Defendant - Appellant-Cross-Appellee


Appeals from the United States District Court
for the Western District of Louisiana


July 12, 1999


Before POLITZ, HIGGINBOTHAM and DAVIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Amoco brought this suit to terminate a mineral lease and joint exploration agreement with Meridian.  Amoco alleged that Meridian drilled a well on a restricted portion of the lease without Amoco's required consent.  The district court determined that Amoco had an unlimited right to prohibit operations in the restricted area.  As a remedy, the district court dissolved the lease and terminated

Meridian's interests in the disputed well and in previously drilled producing wells that were unrelated to the parties' present dispute.

On appeal, Meridian challenges the district court's interpretation of Amoco's right to restrict operations and the remedy the district court imposed. In the alternative, Meridian argues that the district court erred by refusing to allow Meridian to recoup all of its costs incurred in connection with other operations prior to the cancellation of the lease or to retain its interest in the other producing wells. Meridian also claims that the district court erred by granting Amoco attorney's fees and pre-judgment interest on the damages award. Amoco challenges the district court's denial of non-pecuniary damages and seeks attorney's fees for the cost of this appeal.

We AFFIRM the district court on all issues, except the award to Amoco of legal interest on its damages award, which is REVERSED. Amoco's request for attorney's fees on appeal is DENIED.

I

On July 1, 1993, Amoco and Meridian entered a Joint Exploration Agreement covering 5,120 acres of land owned by Amoco in Calcasieu Parish, Louisiana. The JEA allowed Meridian to obtain one-half working interest in a mineral lease covering Amoco's property in exchange for furnishing a seismic survey of the property. Meridian performed the survey, which cost $1,526,409,

and provided the data to Amoco, the other one-half working interest owner. Under the JEA, Amoco and Meridian could drill wells and develop the property by first proposing a drilling site to the other party. The propositioned party had to elect whether to participate or non-consent to the drilling proposal; a non-consent election potentially subjected that party to penalty under the JEA. The extent of the penalty depended upon whether the proposed well was an exploratory well or a development well.

As part of the JEA, the parties agreed to maintain part of the land as a restricted area for ecological reasons. The JEA nowhere explicitly discloses that the restricted area included a mini-wildlife refuge that was negotiated by Amoco with the United States Fish and Wildlife Service, but extrinsic evidence demonstrates that Meridian was aware of the mini-refuge lease. The southern boundary of the mini-refuge was later shifted north by Amoco to accommodate a proposed landfill; Amoco never provided Meridian with a copy of the mini-refuge lease or told Meridian that the southern boundary of the mini-refuge had changed.

After the lease was granted, Amoco and Meridian jointly drilled one productive well, Amoco Ben Todd No. 2. Amoco Ben Todd No. 2 was drilled in the restricted area; however, because the mini-refuge boundary had been moved, it was not drilled in the mini-refuge. Meridian proposed building Meridian Ben Todd No. 1, a deeper well, about 2,050 feet east of the Amoco Ben Todd No. 2. The proposed surface location for Meridian Ben Todd No. 1 was

3

within both the restricted area and the mini-refuge. This well was 300 feet from the revised southern boundary of the mini-refuge and within 500 feet of the eastern boundary. It is undisputed that Meridian knew the proposed well was within the restricted area.

Amoco considered the proposal and decided not to consent to the surface operation in the restricted area. Pat Taylor, Amoco's land negotiator, told Frank Steele, Meridian's land negotiator, of Amoco's decision over the phone and wrote a letter to the same effect, explaining that the proposed well "violates the JEA with regard to locating wells in these environmentally sensitive areas . . . and, in addition, the proposed well is unnecessary." Meridian insists that it offered to discuss a mutually agreeable location for its proposed well but that Amoco refused to respond to these efforts. Amoco claims that Meridian's request to meet with its fee land supervisor was "obviously intended to create a pretext for this breach."

Meridian informed Amoco that it intended to drill the well without Amoco's consent and requested Amoco to elect whether to participate or non-consent. Taylor wrote a second letter to Meridian reiterating Amoco's opposition to the proposed well and suggesting that if Meridian's objective in drilling was to go deeper than the existing Amoco Ben Todd No. 2, then that well could be deepened upon depletion. Amoco claims that it thereafter suggested a conference with Meridian to resolve the dispute, but Meridian resisted. According to a memorandum by Steele, "Amoco has

4

yet to furnish us [Meridian] with any compelling reasons not to drill the well . . . . Amoco evidently believes that they have the unilateral right to prohibit our drilling operations on the fee lands in Section 7 for whatever reason." Amoco then filed a declaratory judgment action on June 28, 1996. Meridian did not seek an expedited ruling from the district court. Instead, Meridian commenced its surface preparations.[1]

When Amoco learned that Meridian had begun surface operations, it amended its suit to claim that Meridian had breached the parties' contract and sought consequential damages as well as cancellation of the lease. Meridian continued its activities despite Amoco's continued objections and lawsuit. Meridian believed that the JEA did not afford Amoco the unlimited right to prohibit access for surface operations. The well was completed in September 1996 and was producing by October 1996.

On August 15, 1997, the district court partially granted Amoco's summary judgment motion against Meridian for breaching the terms of the JEA. After examining the express terms of JEA, the district court held that the restricted areas were subject to Amoco's unconditional right to deny Meridian access to them. Meridian filed a motion for reconsideration, and the district court vacated its prior ruling. The district court reexamined the JEA in

---

[1]Meridian commissioned an environmental consultant to evaluate the proposed site. He opined that the proposed well presented no adverse effects to the area.

great detail and again concluded that the contract unambiguously gave Amoco the right to completely deny Meridian access to the restricted area. The district court also ruled that Amoco was entitled to cancel the lease pursuant to Paragraph 17 of the lease, as incorporated into the JEA.

Damages were later determined by a bench trial. The district court found Amoco's total damages to be $10,561,800.41 ($2,206,342.47 in net income received by Meridian on Amoco Ben Todd No. 2 plus $8,355,457.94 in net income received by Meridian on Meridian Ben Todd No. 1). Meridian's total offset was determined to be $2,817,905.57 ($750,000 in separable improvements on Meridian Ben Todd No. 1 plus $2,067,905.57 for labor costs). The difference, $7,662,293.16, was to be paid with legal interest on the sum from the date of judicial demand, June 27, 1995.

Meridian filed a timely notice of appeal, and Amoco cross-appealed. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

II

The standard of review for summary judgment is well-established. See FED. R. CIV. PROC. 56(C). Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court. See Texas E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998). "When the words of the contract are clear and explicit and lead to no absurd consequences, no

6

further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046 (West 1995). "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Texas E. Transmission Corp., 145 F.3d at 741 (citing Lloyds of London v. Transcontinental Gas Pipe Line Corp., 101 F.3d 425, 429 (5th Cir. 1996)). In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment.

III

Amoco contends that the JEA affords it the right to deny Meridian access to conduct drilling operations in the restricted areas. Moreover, Amoco maintains that Meridian failed to receive Amoco's required consent to drill in the restricted area. Meridian, on the other hand, insists that the JEA only affords Amoco the right to "reasonably restrict" access to the restricted areas in order to accommodate ecological needs. In the alternative, Meridian argues that if the JEA does provide Amoco the right to deny it access to the restricted areas, Amoco's exercise of that right in this situation was an act of bad faith.

As the district court indicated, Article 2 and Article 10.1 of the JEA are the relevant provisions for determining this dispute.

7

Article 2 of the JEA addresses the seismic permit conditions and provides that the seismic activities in the environmentally sensitive "restricted areas," described in Article 10, would be **limited** between July 1 and November 1 and **limited or denied** between November 1 and July 1.  Article 10, entitled "Restricted Areas and Environmental Considerations," provides the following:

> The areas outlined in blue on Exhibit A are **Restricted Areas**, in that **any activities on these areas are restricted and any access may be restricted or limited as determined by AMOCO's Fee Land Manager**.  In addition, **AMOCO shall have the right during the life of this JEA to require a cessation of any seismic, drilling or other operations anywhere on AMOCO Fee Lands which in AMOCO's opinion is necessary to meet ecological needs of wildlife** . . . .  Any such cessation . . . shall serve to extend the 180-day CDP [Continuing Development Program] of the Lease . . . .[2]  **Notwithstanding the provisions of the Lease, either party shall have the right to propose the drilling of an Exploratory Well to test a Prospect Area which is partially or wholly included within a Restricted Area, as long as no surface operations are conducted within such Restricted Area without the prior written consent of AMOCO.**

The district court carefully analyzed the words and phrases of Articles 2 and 10 and concluded that the only reasonable interpretation of these provisions unambiguously furnishes Amoco with the right to restrict access, even to the point of complete denial, to the restricted areas.  Thus, the district court held that there is no genuine issue of material fact regarding any

---

[2]This third sentence concerns Paragraph 2 of the Oil and Gas Lease and deals with the availability of a continuous drilling program for a secondary term under the JEA when a "forced cessation" by Amoco based on ecological needs occurs; it does not create such an extension when a cancellation based on a violation of the JEA occurs during the primary term.

reasonable alternative interpretation of the JEA. We agree.

The district court also rejected Meridian's argument that Amoco acted in bad faith in exercising its right to restrict. Louisiana law requires contracts to be performed in good faith. See La. Civ. Code Ann. art. 1983 (West 1987). Meridian claims that Amoco's reasons for not consenting were a pretext to avoid penalty payments and that Amoco's failure to inform Meridian that its proposed well could have been moved 300 feet to the south side of the revised east-west boundary of the mini-refuge demonstrates bad faith. Despite grumbles about the unannounced boundary changes in the mini-refuge, it appears that the restricted area itself never changed.

While there is evidence that the parties' communication efforts were far from exemplary, none of Meridian's allegations establishes any conduct by Amoco that was not permitted by its contractual rights under the JEA. Therefore, we agree with the district court's conclusion that there is no genuine issue of material fact concerning Amoco's good faith. We affirm the district court's summary judgment ruling in favor of Amoco's unlimited right to deny Meridian drilling access in the restricted areas.


IV

After determining the extent of Amoco's right to restrict, the district court dissolved the lease pursuant to Paragraph 17 of the

9

Oil and Gas Lease.[3]  Meridian argues that the district should not have allowed the lease to be canceled because dissolution is a disfavored, harsh remedy and because Amoco failed to provide the requisite pre-suit notice.  According to Meridian, notice was lacking because Amoco "never particularized that Meridian's purported default could be cured by moving its surface location a mere 300 feet . . . ."  Amoco argues that cancellation was a remedy for which Meridian assumed the risk when it signed the lease and when it decided to drill the disputed well.

Whether or not to dissolve a lease completely is subject to judicial discretion.  See Publicker Chem. Corp. v. Belcher Oil Co., 792 F.2d 482 (5th Cir. 1986).  The district court found that the cancellation clause expressly provided for dissolution of the lease as a remedy for a breach, and it concluded that Amoco had fulfilled its duty of notice by explicitly and repeatedly informing Meridian that it refused to give its required consent to drill the Meridian Ben Todd No. 1. at the proposed site.

While it would have been more cooperative of Amoco to explain to Meridian that a 300 foot shift to the south would have located the proposed well outside of the mini-refuge, we must agree with the district court that Amoco was not required to do so in order to

---

[3]Paragraph 17 of the Oil and Gas Lease provides that:
> If Lessee fails to comply with any of the other provisions of this Lease, **Lessor may terminate the Lease**, if **within twenty (20) days after notice by Lessor**, Lessee has not complied with such provision.

fulfill its obligation of notice. In addition, Meridian could have moved its proposed well site 500 feet to the east, outside the restricted area, after Amoco denied consent to the proposed drilling site in the restricted area. Considering the explicit terms of the JEA and Meridian's actions in light of Amoco's unambiguous non-consent, we find that the district court's decision to allow the lease to be canceled was not an abuse of discretion.

V

In the alternative, Meridian argues that the district court should have granted only partial cancellation of the lease because of Meridian's performance of its other lease obligations and because of the "savings clause" in Paragraph 17. First, Meridian's "savings clause" argument is meritless. The savings clause in Paragraph 17 provides:

> If Lessee fails to commence operations on a well hereunder or conduct continuous operations as herein provided, or if Lessee fails to secure the formation of units as herein provided, all of the Lessee's rights hereunder shall automatically terminate, without notice, . . . Except as to those portions Lessee may be permitted to retain under Paragraph 2 (which refers to the continuous drilling program) hereof.

The "savings" part of the Paragraph 17 pertains to a lessee's failure to commence or continue drilling. The dispute here did not arise from Meridian's failure to commence or continue drilling, but from another provision of the lease concerning the required consent of Amoco for drilling in restricted areas. The next sentence in Paragraph 17 explicitly provides that if a lessee "fails to timely

11

comply with any of the other provisions of this Lease," termination is an available remedy to the lessor.  Therefore, the district court correctly rejected this argument.

Next, Meridian argues that its partial performance of other obligations should be credited.  The expenditures for these acts include the following:

1.  Meridian requests $1,526,409 in reimbursement for the seismic survey.

2.  Meridian requests $911,040 in expenses incurred for co-producing the Amoco Ben Todd No. 1.

3.  Meridian requests $671,753 in expenses incurred for co-producing the Meridian Gayle Well.

4.  Meridian requests $673,552.45 in unrecovered costs from its participation in Amoco Ben Todd. No. 2.

Meridian relies upon Article 2018 of the Louisiana Civil Code, which provides that "upon dissolution a contract, the parties shall be restored to the situation that existed before the contract was made," and Article 2019, which provides that "in contracts providing for continuous or periodic performance, the effect of dissolution shall not be extended to any performance already rendered," to support its argument that it should recover its pre-breach costs.

The district court considered Meridian's arguments about reimbursement for pre-breach costs and rejected them.  The district court found that each of the above-described expenditures was rendered in performance of Meridian's obligations under the JEA before the cancellation and was unrelated to the disputed breach of

12

the JEA. The district court reasoned that to reimburse Meridian after the breach of the JEA would "extend the effect" of Amoco's "dissolution" to already rendered contractual obligations unrelated to the present dispute.

The logic of this reasoning is more apparent in the reverse situation. For instance, if at the time of the breach Meridian had already recouped its costs from its other performance expenditures or even recognized a profit from the other acts, a dissolution of the lease based on a later act would not require the unraveling of previous payments or performances. Therefore, we find no abuse of discretion in the district court's refusal to allow Meridian to recoup costs it incurred in connection with operations completed prior to the cancellation of the lease.

The district court also denied Meridian's request to retain an interest in any "separate" leases because it found Meridian's breach to have been committed in bad faith and concluded that Paragraph 17 gave Amoco the right to terminate the entire lease. Again, we find no abuse of discretion by the district court in refusing to allow Meridian to retain any interest in the other producing wells.

VI

Amoco, which opted to retain the benefit of Meridian Ben Todd No. 1, challenges the district court's decision to credit Meridian the current value of materials and workmanship of that well.

13

Although Meridian was not entitled to any of its production costs preceding the breach, the district court ruled that, under Article 497 of the Louisiana Civil Code, Meridian was entitled to offset $2,067,905.57 incurred in connection with labor expenses for Meridian Ben Todd No. 1, which the court determined was a separable improvement. Article 497 provides:

> When constructions, plantings, or works are made by a bad faith possessor, the owner of the immovable may keep them or he may demand their demolition and removal at the expense of the possessor, and in addition, damages for the injury he may have sustained. **If he does not demand demolition and removal, he is bound to pay at his option either the current value of the materials and of the workmanship of the separable improvements that he has kept** or the enhanced value of the immovable.

The district court determined that $2,067,905.57, the combined sum of what Meridian paid in labor expenses connected to the installation of raw and manufactured materials ($562,500) and labor and equipment costs ($116,012.50), qualified as reimbursable "workmanship."

Amoco argues that Article 497 does not include the labor cost of constructing separable improvements because such costs are not included in the definition of workmanship. Amoco asserts that "workmanship" refers to the quality of the materials used in constructing the well. Amoco suggests that the cost of "quality" has been reflected in the purchase price of the materials, which was stipulated to be $750,000. Amoco also argues that a bad faith possessor does not have a right to reimbursement. See La. Civ.

14

Code art. 488 ("Products derived from a thing as a result of diminution of its substance belong to the owner . . . . [A] possessor in good faith has the right to reimbursement of his expenses. A possessor in bad faith does not have this right.")

We find that the district court correctly applied Article 497 because the Meridian Ben Todd No. 1 is a separable improvement to Amoco's land. Furthermore, in Nabors Oil & Gas Co. v. Louisiana Oil Refining Co., 91 So. 765, 774 (La. 1922), the Louisiana Supreme Court held that even a bad faith oil producer was entitled to recover labor costs incurred in installing a well and bringing it into operational condition. It would be unreasonable to calculate "workmanship" as merely the purchase cost of materials when workmanship necessarily includes the skills and efforts of a laborer to make the materials useful. Accordingly, we affirm the district court's decision to credit Meridian the current value of materials and workmanship on Meridian Ben Todd No. 1.


                              VII

Meridian argues that the district court erred by granting Amoco attorney's fees. The district court based its decision upon La. Min. Code art. 209, La. Rev. Stat. § 31:209, which authorizes attorney's fees when a lease is canceled. Article 209 provides that "[t]he right to secure damages and attorney's fees under

15

Article 207[4] is applicable also to a demand for dissolution of a mineral lease for failure to comply with its obligations." Meridian claims Article 209 is inapplicable because the primary relationship it shared with Amoco was that of a co-working interest owner in a joint exploration agreement, not a lessee.

Article 11 of the JEA defines the parties' relationship and expressly negates the creation of any kind of partnership, joint venture, or association. Accordingly, the district court did not err by awarding attorney's fees to Amoco.

## VIII

Next, Meridian argues that the district court erred by awarding Amoco legal interest on its damages award. The district court held that Amoco's damages were "tort damages for wrongful conversion of mineral production" and were therefore eligible for legal interest under La. Rev. Stat. Ann. § 13:4203. This statute provides for interest from the date of judicial demand for damages arising "*ex delicto*," as opposed to "*ex contractu*." Meridian

---

[4]Article 207 provides the following:
> If the former owner of the extinguished or expired mineral right fails to furnish the required act within thirty days of receipt of the demand or if the former lessee of a mineral lease fails to record the required act within ninety days of its extinguishment prior to the expiration of its primary term, he is liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit.

16

argues that this action was not a tort action, but a breach of contract lawsuit, and therefore not eligible for legal interest under § 13:4203. We review the award of prejudgment interest for an abuse of discretion.

The question before us is whether the present judgment sounds in damages *ex delicto*. In diversity cases, issues of prejudgment interest are governed by state law. See Lib. Mut. Fire Ins. Co. v. Canal Ins. Co., 1999 WL 332704, *10 (5th Cir. May 26, 1999). The Louisiana Court of Appeals explained that "[t]he classical distinction between 'damages *ex contractu*' and 'damages *ex delicto*' is that the former flow from the breach of a special obligation contractually assumed by the obligor, whereas the latter flow from the violation of a general duty owed to all persons." Davis v. LeBlanc, 149 So. 2d 252, 254 (La. App. 1963). Under Davis, legal interest under § 13:4203 is not available in "favor of judgments such as the present [an action in redhibition], which awarded damages primarily on the basis of the violation of a contractual duty . . . ," but limited "the benefits of the special statute to judgments sounding in damages *ex delicto*."

Although we recognize that Meridian's conduct may have violated the general duty not to wrongfully convert minerals, we find that the recovery sought was essentially based on the alleged violation of a contractual duty. The district court awarded Amoco damages because it determined that Meridian had breached the lease.

17

Therefore, we find that the present judgment does not sound in damages *ex delicto*.  Accordingly, Amoco is not entitled to legal interest on its award.


                                IX

    Amoco argues that the district court wrongly refused to grant non-pecuniary damages.[5]  The district court denied Amoco's request for non-pecuniary damages because it found Amoco's non-pecuniary interest to be "so insusceptible to measurement as to be impossible to quantify."  Amoco claims that the district court's reason for denial was an error of law.

    Amoco asserts that "Louisiana law expressly provides for recovery of such [non-pecuniary] damages when not susceptible to measurement."  According to La. Civ. Code art. 1989, "[w]hen [non-pecuniary] damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."

    Amoco argues that the district court wrongfully declined to

_____

[5]La. Civ. Code art. 1988 provides:
> Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
>
> Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.


                                18

perform a "reasonable assessment of the damages" because it found the non-pecuniary damages to be immeasurable. We disagree. The district court quoted Article 1989 in its opinion, demonstrating an awareness of its authority to assess damages even when damages were insusceptible to precise measurement. The district court performed a "reasonable assessment of the damages" and concluded no non-pecuniary damages would be awarded. Given the amount of discretion Article 1989 provides a district court, we find no abuse of it here.

X

Amoco requests reasonable fees for this appeal, but cites no additional authority other than La. Min. Code art. 209, La. Rev. Stat. § 31:209, which authorizes attorney's fees when a lease is canceled. We note that both parties raised substantive issues on appeal and find that both parties contributed to the dysfunctional communications resulting in this dispute. We decline to award Amoco attorney's fees on appeal.

XI

The judgment of the district court is AFFIRMED on all issues, except the award to Amoco of legal interest on its damages award, which is REVERSED. Amoco's request for attorney's fees on appeal is DENIED.

19