**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 02-30230
Summary Calendar

---

Millers Mutual Fire Insurance Company, Inc.,

Plaintiff-Appellant,

VERSUS

Terral Seed, Inc.,

Defendant-Appellee.

---

Appeal from the United States District Court
For the Western District of Louisiana

---

(01-CV-44)

August 19, 2002

Before DeMOSS, PARKER and DENNIS, Circuit Judges.

PER CURIAM:[*]

### BACKGROUND

Terral Seed, Inc. ("Terral") sells various agricultural products, including seed, fertilizer, grain, and pesticides.

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

Terral is an authorized applicator of Fipronil/Icon. Fipronil/Icon is applied to rice seed at the customer's request. During the crop year of 1999 and 2000 various rice and crawfish farmers purchased rice seed from Terral which had been treated with Fipronil/Icon. The treated rice seed was applied to rice/crawfish fields by a crop duster. The treated seed caused a crawfish mortality which resulted in damage to the crops. Several suits were brought against Terral by different farmers.

Millers Mutual Fire Insurance Company, Inc. ("Millers") issued an agribusiness insurance policy to Terral that was in force during the time the damage occurred to the rice/crawfish crop. The policy provided coverage for general commercial liability. Millers was required to pay any sums which Terral was legally obligated to pay due to property damage. However, Millers denied coverage on the basis that the insurance policy contained an exclusion for damage caused by "seed." Millers filed an action seeking a declaratory judgment that the policy excluded coverage. The district court granted summary judgment in favor of Terral, finding that the damage was caused by the Fipronil/Icon and not the seed. Furthermore, the court found that the language of the policy was ambiguous and thus must be construed in favor of coverage. Millers appeals.

## ANALYSIS

We have jurisdiction based on 28 U.S.C. § 1332. When

confronted with a diversity case arising under state law, we must apply the law of that state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). We are emphatically not permitted to do merely what we think best; we must do that which we think the [Louisiana] Supreme Court would deem best. *Nautilus Ins. Co. v. Zamora*, 114 F.3d 536, 538 (5th Cir. 1997). We review the district court's interpretation of an insurance contract and its exclusions as a question of law and, thus, is subject to *de novo* review. *Lubbock County Hosp. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 143 F.3d 239, 242 (5th Cir. 1998).

Louisiana law requires that interpretation of an insurance policy be subject to the general rules of contract interpretation. *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d. 759, 763 (La. 1994). Our role when interpreting an insurance contract is to determine the common intent of the parties. *Id.*; *see* LA. CIV. CODE ANN. art. 2045 (West 2001). "The parties' intent as reflected by the words in the policy determine the extent of coverage." *Id.* "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046 (West 2001); *see Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc.*, 180 F.3d 664, 667 (5th Cir. 1999). We construe the intent of the parties to an insurance contract to be determined "in accordance with the general, ordinary, plain,

and proper meaning . . . unless [they] have  acquired a technical meaning."  *Carbon v. Allstate Ins. Co.*, 719 So. 2d 437, 440 (La. 1998); *see* LA. CIV. CODE ANN. art. 2047 (West 2001).

Exclusions from the policy must be clearly set forth and unambiguous.  When the language is clear and unambiguous it must be enforced as written.  *Reynolds v. Select Props. Ltd.*, 634 So. 2d 1180, 1183 (La. 1994).  *See also Edwards v. Your Credit Inc.*, 148 F.3d 427, 444 (5th Cir. 1998).  When applying Louisiana law courts should not "strain to find ambiguities, if, in so doing, they defeat probable intentions of the parties."  *Sharp v. Fed. Sav. & Loan Ins. Corp.*, 858 F.2d 1042, 1045 (5th Cir. 1988).  This remains true even if the result is an apparently harsh consequence.  *Id.* However, if the terms of the policy are ambiguous, they must be construed against the drafter.  *Id.  See also Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 407 (5th Cir. 2000).

The relevant portion of the insurance policy provides:

> This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

The Schedule contains the single word "SEED."  No further definition of the term is provided.

The dispute centers on the meaning of the word "seed."  We must determine what the parties intended to exclude from coverage by adding the word "seed" to the Schedule.  We find that when given

-4-

its ordinary meaning the term "seed" is clear and unambiguous. Using the ordinary meaning does not lead to absurd consequences and, thus, our inquiry into the parties' intent ceases.

Terral argues that the damage to the crawfish was done only by the Fipronil/Icon and that the rice seed had nothing to do with it. Terral also asserts that this question creates an ambiguity within the language of the policy. Therefore, the seed exclusion would not apply and must be enforced in favor of coverage. We disagree. "The fact that one party can, in hindsight, create a dispute about the meaning of a contractual provision does not render the provision ambiguous." *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996). We do not see any ambiguity in the original contract. The alleged ambiguity has been created with the aid of hindsight.

Terral's argument also ignores the fact that it was a Fipronil/Icon rice seed that was put into the field. It was a single unit. When the Fipronil/Icon treatment was applied, the pesticide became part of the seed. The treatment caused the rice seed to become a different type of seed. Nevertheless, it was still a seed. Before the treatment, it was an ordinary rice seed. After the treatment, it was a Fipronil/Icon rice seed. The damage was done by a Fipronil/Icon rice seed. Even after applying a treatment to a seed it is still classified as a seed.

Congress has followed a similar line of reasoning in the

-5-

Federal Seed Act. 7 U.S.C. § 1551 *et seq.* (2002). When dealing with agriculture under Title 7, Congress has specifically devoted Chapter 37 to seeds. *Id.* Within the broad category of seeds Congress includes "treated" seeds. *See* § 1561(23). "The term "treated" means given an application of a substance or subjected to a process designed to reduce, control, or repel disease organisms, insects or other pests which attack seeds or seedlings growing therefrom." *Id.* The fact that a treatment is applied to the seeds to reduce or repel disease or pests does not prevent the seeds from being considered seeds under the Federal Seed Act. We agree with the reasoning of Congress; a treated seed is still a seed.

Moreover, the words of the contract are clear and explicit and do not lead to any absurd consequences. By including the term "seed," the parties intended to exclude all seed from coverage. Any other reading would lead to an absurd result. For example, if we were to find that the exclusion included white seed, but not brown seed, it would be an absurd conclusion because there is nothing in the policy to indicate such an intent. Likewise, to find that the exclusion encompasses non-treated seed, but not treated seed, would be absurd and go against the clear and explicit language in the policy. There is nothing in the language to indicate an intent to exclude only certain types of seeds. The policy simply includes all "seed." Had the parties intended to exclude only certain types of seed, the specific exclusions would

have been enumerated in the policy.

Terral suggests, if Millers had intended for "seed" to include seed treated with a pesticide, it should have "said so clearly and expressly." On the contrary, Millers did clearly and expressly include all types of seed. The exclusion does not attempt to include some seeds while leaving others out, it simply says "seed." Under Terral's theory, to achieve the result of excluding all seed, Millers would have been required to list every imaginable variety of seed. For example, the policy would begin to look something like this: Arugula Seed, Bean Seed, Beet Seed, Broccoli Seed, Brussels Sprout Seed, Cabbage Seed, Cantaloupe Seed, Carrot Seed, Cauliflower Seed, Corn Seed, Cucumber Seed, Eggplant Seed, Garden Huckleberry Seed, Gourd Seed, Ground Cherry Seed, Kale Seed, Leek Seed, Lettuce Seed, Okra Seed, Onion Seed, Pea Seed, Pepper Seed, Radish Seed, Brown Rice Seed, White Rice Seed, Spinach Seed, Squash Seed, Swede Turnip Seed (Rutabega), Swiss Chard Seed, Tomato Seed, Tomatillo Seed, Turnip Seed, Watermelon Seed, Bird Seed, Tall Fescue Grass Seed, Kentucky Bluegrass Seed, Perennial Ryegrass Seed, Geranium Seed, Impatiens Seed, Marigold Seed, Pansy Seed, Sunflower Seed, Sweet Pea Seed, Dill Seed, Hyssop Seed, Lavender Seed, Lemon Seed, Oregano Seed, Parsley Seed, Peppermint Seed, Rosemary Seed, Sage Seed, Thyme Seed.

The list only begins to scratch the surface of the numerous types of seeds and their varieties. The list would become extremely long and still run the risk of inadvertently omitting

unusual seeds such as the Whipcord Cobra Lily Arisaema tortuosum seed.[1]  Furthermore, this method would have created additional confusion.  Instead, Millers chose, and Terral agreed to, the simpler method of excluding "seed" from coverage.  We find this simpler method perfectly acceptable.  The use of the term "seed" to include all seeds is clear and unambiguous.  It encompasses all varieties, mixtures, groups, sizes, categories, and types of seed.

Finally, the fact that the term "seed" was included in the policy suggests an intent of the parties to exclude seed that had a potential for causing harm to persons or property.  Such an intent is demonstrated because there would be no reason to exclude harmless seed from an insurance policy which covers damage to persons or property.  We are left to conclude that the reason for the exclusion was to limit Millers liability from damage caused by harmful seeds such as those treated with dangerous chemicals.

**CONCLUSION**

We cannot find any ambiguity within the language of the policy.  The word "seed" is not susceptible to greater than one

---

[1] An "unusual houseplant or conversation plant from the Himalayas.  The thick 4' tall fleshy petiole (stalk) emerges in early June, adorned by two tropical looking palmate green leaves near the top.  As the leaves unfurl, the pitcher that tops the stem opens to reveal a green jack-in-the-pulpit flower, but with a whip-like tongue that extends from the mouth of the flower upwards to 12 or more inches."  http://www.seedman.com/limited.htm (July 12, 2002).  *See also* http://www.npr.org/programs/talkingplants/profiles/arisaema.html (July 12, 2002).

reasonable interpretation.  It is just what it says; "seed."  The intent of the parties at the time of contracting was to exclude all "seed" from coverage.  Because "seed" was excluded from the insurance policy, Millers has no liability for the damage caused by the Fipronil/Icon rice seed.  Finding no ambiguity, the insurance policy  must be enforced as written.  We reverse the decision of the district court and remand for proceeding not inconsistent with this opinion.

JUDGMENT REVERSED and REMANDED.