# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 14-30416

———

ANGUS CHEMICAL COMPANY,

Plaintiff - Appellee

v.

GLENDORA PLANTATION, INCORPORATED,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2015

Lyle W. Cayce
Clerk

———

Appeal from the United States District Court
for the Western District of Louisiana

———

Before BENAVIDES, SOUTHWICK, and COSTA, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

This contract dispute involves a Right-of-Way Easement Option ("Agreement") involving Plaintiff-Appellee Angus Chemical Company ("Angus") and Defendant-Appellant Glendora Plantation, Inc. ("Glendora"). This appeal arises from the district court's grant of Angus's motion for partial summary judgment, denial of Glendora's motion for partial summary judgment, and denial of Glendora's motion to compel discovery. The specific issues brought on appeal are: (1) whether Angus had authority under the Agreement to abandon the original 12" pipeline in place when it constructed a new 16" pipeline, (2) whether Angus had authority under the Agreement to

No. 14-30416

install fiber optic cables, and (3) whether it was improper for the district court to deny Glendora's motion to compel discovery.

## I. FACTUAL AND PROCEDURAL HISTORY

Angus owns a facility in Sterlington, Louisiana, that produces nitroparaffin products, a byproduct of which is wastewater containing formaldehyde and acetone. The wastewater is removed through an underground pipeline that goes through land owned by others to a wastewater treatment plant three and one-half miles away. In 1978, IMC Chemical Group, Inc. ("IMC"), Angus's predecessor-in-interest, obtained rights of way or servitudes from the other landowners to construct and operate a wastewater pipeline. At issue here is the "Right of Way Easement Option" granted by George and Mary Tilford Smelser on March 28, 1978, to IMC and its successors and assigns. The Agreement provides in relevant part:

> GEORGE P. SMELSER and MARY TILFORD SMELSER[] . . .
> does hereby grant, bargain, sell and convey unto IMC CHEMICAL
> GROUP, INC., . . . its successors and assigns, . . . an option to
> acquire a right of way and easement with the right to construct,
> maintain, inspect, operate, protect, alter, repair, replace and
> change the size of a pipeline for the transportation of liquids,
> gases, solids in either singular or mixed form or any other
> substances which can be transported through pipelines, together
> with all incidental equipment and appurtenances, either above or
> below ground, including but not limited to filtering devices, valves,
> meters, drips and other necessary and convenient installations, on,
> over, under, across and through the following described property,
> along a route to be selected by the Grantee[.]

IMC exercised the option on August 31, 1978, after which the option "automatically [became] an indefeasible right of way agreement without further actions being necessary, and all of the rights, title and privileges herein granted . . . thereafter [became] vested in [IMC], its successors or assigns."

2

No. 14-30416

In 1979, IMC constructed a 12" pipeline from its Sterlington plant, across the Smelser property, and to its wastewater treatment facility. Angus subsequently purchased the rights from IMC, and Glendora purchased the Smelser property. Leaks from the pipeline occurred in 2007, 2010, and 2011, after which Angus decided to replace the pipeline. In 2010, Angus began to design a 16" pipeline to replace the 12" pipeline.[1]

Angus sought permission to abandon the 12" pipeline from the affected landowners, and all but Glendora agreed. On January 26, 2012, Angus proposed a "Supplemental Agreement" that provided in relevant part:

> It is further understood and agreed that, after the sixteen inch (16") pipeline is installed and in service, then the existing twelve inch (12") pipeline currently in service across [Glendora's] property will be flushed and cleaned and [Angus] will be allowed by [Glendora] to abandon in place, and [Angus] shall have no future responsibility or obligations for the twelve inch (12") pipeline abandoned on [Glendora's] property.

On January 27, 2012, Angus proposed a "Pipeline Servitude Ratification and Acknowledgement" that, *inter alia*, sought to "acknowledge[] and confirm[]" that the right of way included the right to "abandon[] in place" one 12" pipeline, and offered to pay Glendora for authorization. Glendora did not agree to either of these proposals.

On June 14, 2012, Angus filed a complaint seeking a declaratory judgment that (1) Angus has a valid servitude;[2] (2) per the servitude, Angus may abandon the 12" pipeline after a new pipeline is in service; (3) Angus may lay a 16" pipeline, fiber optic cables, and a tracer wire; (4) the servitude will be 50' wide during construction of the 16" pipeline and 30' wide thereafter; and

---

[1] Internal Angus emails from March 2011 suggest that Angus initially planned to remove the 12" pipeline after the 16" pipeline was put into service.

[2] In the alternative, Angus sought a declaratory judgment that it acquired the servitude by acquisitive prescription.

3

No. 14-30416

(5) Angus will have right of ingress and egress during construction. Glendora filed an answer and counterclaim on August 13, 2012, and an amended answer and counterclaims on October 25, 2012.

After the suit was filed, Angus began construction of the 16" pipeline. Angus also installed two fiber optic cables parallel to the 16" pipeline, and a tracer wire on top of the pipeline. The 16" pipeline was completed and placed into service on October 3, 2012. The 12" pipeline was taken out of service that same day. By the end of November of 2012, Angus flushed, cleared, plugged, and abandoned the 12" pipeline in place.

On March 5, 2013, Glendora filed a motion to compel discovery, which was opposed by Angus. Both parties filed motions for partial summary judgment. Angus moved for summary judgment on the following issues: (1) that Angus has a valid and enforceable servitude through Glendora's property, (2) that the Agreement is a personal servitude of rights of use, (3) that Angus is not a trespasser, (4) that Glendora is not entitled to recovery of Angus's profits, and (5) that Angus's installation of the fiber optic cables and tracer wire was within the bounds of the Agreement. Glendora moved the district court to (1) find that Angus did not have authority under the Agreement to abandon the 12" pipeline, (2) find that Angus did not have authority to construct and operate the 16" pipeline and fiber optic cables with the 12" pipeline in place, (3) declare that Angus is a trespasser on Glendora's property, (4) declare that Angus's trespass is in bad faith, and (5) dismiss Angus's request for a declaratory judgment.

4

No. 14-30416

While these motions were pending, on April 22, 2013, the magistrate judge denied Glendora's motion to compel discovery,[3] and Glendora appealed to the district court judge.

On November 20, 2013, the district court granted Angus's motion for partial summary judgment and denied Glendora's motion for partial summary judgment and motion to compel discovery. The court found:

> [(1)] that Angus has a valid and enforceable servitude through the property of Glendora; [(2)] that the Right-of-Way Agreement created a personal servitude of rights of use; (3) that Angus had the authority under the Right-of-Way Agreement to construct the 16" pipe and abandon the original 12" pipeline in place; and (4) that Angus had the authority under the Right-of-Way Agreement to install fiber optic cables and tracer wires.

The court found it unnecessary to reach Glendora's trespass and trespass-in-bad-faith arguments. On April 28, 2014, the parties reached a settlement on Glendora's remaining claims related to a pipeline spill in December 2011, and the district court certified as final and appealable its order granting partial summary judgment to Angus and denying partial summary judgment to Glendora, its denial of Glendora's appeal of the magistrate judge's ruling on the motion to compel, and the magistrate judge's order denying the motion to compel. On April 30, 2014, Glendora filed its notice of appeal.

## II. STANDARD OF REVIEW

This Court reviews a district court's ruling on a motion for summary judgment *de novo,* "viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). "The

---

[3] The magistrate judge felt "compelled to weigh in" on the issues raised by the motion to compel—despite the fact that the same issues were pending before the district court in the motions for partial summary judgment—"because of Glendora's approaching . . . expert report deadline."

5

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A district court's discovery ruling is reviewed for abuse of discretion. *Turnage v. Gen. Elec. Co.*, 953 F.2d 206, 208 (5th Cir. 1992) (citing *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986)). Discovery rulings are reversed "only where they are arbitrary or clearly unreasonable." *Mayo*, 787 F.2d at 1012.

## III. APPLICABLE LAW

Louisiana law governs this dispute. *See Erie v. R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206. In the absence of such a decision, "we must make an *Erie* guess and determine, in our best judgment, how [the Louisiana Supreme Court] would resolve the issue if presented with the same case." *Id.* In making an *Erie* guess, "we first examine primary sources of law: the constitution, codes, and statutes." *Id.* "Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana. When the analysis calls for interpreting a contract, the Louisiana Civil Code is the starting point." *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 175 (5th Cir. 1999) (footnote omitted).

Under the Louisiana Civil Code, "[i]nterpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ANN. art. 2045. "The language of the policy is the starting point for determining that common intent." *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009). "The words of a contract must be given their generally prevailing meaning." LA. CIV. CODE ANN. art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." *Id.* art. 2048.

No. 14-30416

> The determination of whether a contract is clear or ambiguous is a question of law. Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate.

*Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007) (internal citations omitted). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046. "[O]nly when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc.*, 180 F.3d 664, 669 (5th Cir. 1999). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV. CODE ANN. art. 2053. "[A]mbiguity in a servitude agreement must be construed in favor of the servient estate." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 315 (5th Cir. 2002); *see* LA. CIV. CODE ANN. art. 730 ("Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.").

## IV. DISCUSSION

In the following sections, we consider the issues that have been appealed from the district court: (1) whether the Agreement allowed Angus to abandon the 12" pipeline, (2) whether the Agreement allowed Angus to install the fiber

No. 14-30416

optic cables, and (3) whether the district court improperly denied Glendora's motion to compel discovery.[4]

### A. Whether Angus Had Authority Under the Agreement to Abandon the Original 12" Pipeline in Place After Constructing the 16" Pipeline

It is undisputed that the 16" pipeline could replace the 12" pipeline. The dispute before us concerns whether, in replacing the 12" pipeline, the 12" pipeline had to be removed. Glendora makes two separate arguments for how Angus's abandonment of the 12" pipeline violates the Agreement: (1) the term "replace" requires Angus to remove the 12" pipeline, and (2) the Agreement permitted the maintenance and operation of "a pipeline" but Angus is now maintaining and/or operating two pipelines.

### i. Whether the Agreement Required Removal of the 12" Pipeline

### 1. Interpretation of "Replace"

The crux of the dispute as to the meaning of "replace" in the Agreement is that Glendora contends that one cannot "replace" something without removing the original while Angus claims that "replace" does not impart an obligation to remove the substitute's predecessor.

The district court found that "[t]he clear and unambiguous language of the Right-of-Way Agreement permit[ted] Angus to 'replace' the 12" pipeline."

---

[4] During oral argument, Angus argued that, while the 12" pipeline has been cleared and capped and is not in use, Glendora does not have a right to remove the pipe itself. Despite consistently referring to the 12" pipeline as "abandoned" in its brief, Angus seemed to argue during argument that it has a continuing right over this 12" pipe because (1) the Agreement grants a right to "incidental equipment and appurtenances" as well as "other necessary and convenient installations," and (2) Louisiana Civil Code article 642 provides that the right of use granted in a servitude extends to "rights that may later become necessary." LA. CIV. CODE ANN. art. 642. Because this argument was not briefed to the district court nor to this Court such that Glendora could respond in any meaningful way, we decline to rule on the matter and whether or not such a construction would expand or create rights in favor of Angus beyond the rights created by the initial Agreement.

No. 14-30416

To give the term "replace" its generally prevailing meaning, as required by Louisiana Civil Code article 2047, the court considered various dictionary definitions of "replace" proffered by both parties. The following are relevant definitions of "replace":

*Merriam-Webster*:
      2: to take the place of especially as a substitute or successor
      3: to put something new in the place of <*replace* a worn carpet>[5]

*American Heritage Dictionary*:
      2. To take the place of: *Jets have largely replaced propeller planes. Nurse practitioners are replacing doctors in some clinics.*
      3. To fill the place of; provide a substitute for: *replaced the team's coach; replaced the wall-to-wall carpeting with hardwood floors.*[6]

After reviewing these definitions, the court concluded that "[a]lthough the term 'replace' could, in some cases, imply a corresponding duty to remove, the Court agrees with Angus that the appropriate definition in this case is to 'substitute.'" However, "substitute" was not actually a full definition that was proffered to the court. Angus's argument, which the court refers to, was that in common usage, the term "replace" is more akin to "substitute." This does not actually define the term "replace." None of the dictionary definitions of "to replace" is simply "to substitute." Furthermore, the closest dictionary definitions involving "substitute"—"to take the place of especially as a substitute or successor" and "to fill the place of; provide a substitute for"—still lead to ambiguity as to whether the taking or filling the place of a previous item necessitates the previous item's removal. One could reasonably interpret that

---

[5] *Replace Definition*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/replace (last visited Mar. 2, 2015).

[6] *Replace Definition*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2014), https://www.ahdictionary.com/word/search.html?q=replace&submit.x=0&submit.y=0 (last visited Mar. 2, 2015).

one can "replace" something in operation without physically removing the item that has been replaced (the interpretation taken by the district court and Angus), and one could also reasonably interpret that one can "replace" something by switching one item out for another (the interpretation taken by Glendora).

Besides considering dictionary definitions in its search to find the generally prevailing meaning of "replace," the court also noted,

> Finally, as a final "illustration" that "'remove' is not part and parcel of the right to 'replace,'" Angus cites *Terrebonne* . . ., where the defendant was granted "'a servitude, right of way and easement to construct, lay, maintain, operate, alter, repair, *remove*, change the size of, and *replace* a pipeline and appurtenances thereof . . . .'"

(emphasis added by district court). *Terrebonne* does not seem particularly helpful in the interpretation question of whether the term "replace" implies removal of the object being replaced since the case did not involve an interpretation of these terms.[7]

Angus argues that Glendora confuses the district court's analysis as interpreting an ambiguous contractual term when "[t]he purpose of the court's analysis was not to discern the meaning of an ambiguous term, but rather to determine the generally prevailing meaning of that term." It is too much of a stretch to say that the Agreement is clear and unambiguous in its language when there are multiple reasonable interpretations of the *implications* of the word "replace." We find that there is a material fact issue as to whether the

---

[7] Further, the inclusion of both "remove" and "replace" in the *Terrebonne* servitude does not necessarily mean that removal was not part and parcel of the right to replace; it seems reasonable to alternatively interpret the servitude as providing for the replacement of a pipeline with another pipeline (and removal of the older pipeline), *as well as* removal of a pipeline without the installation of a new one.

No. 14-30416

Agreement requires the removal of the 12" pipeline, and on that basis, we conclude that awarding partial summary judgment to Angus was improper.

## 2. Consideration of Extrinsic Evidence

We now assess the district court's consideration of extrinsic evidence in light of our finding above. Glendora argues that, by considering extrinsic evidence to interpret the Agreement, the district court acknowledged that the Agreement was ambiguous but improperly did not resolve the ambiguity in its favor. While Glendora points out three "examples" of extrinsic evidence reviewed by the district court, only one of the three—consideration of "the apparent practice of others holding servitudes on Glendora"—is actually extrinsic evidence.[8]

After finding that its chosen definition of "replace" "render[ed] the contract effective and reflect[ed] the object of the makers to allow the chemical company to operate one pipeline through the property to dispose of wastewater at its wastewater facility," the district court went on to consider extrinsic evidence: "Further, such a definition is consistent with the apparent practice of others holding servitudes on Glendora when, as Angus points out, old pipe not belonging to Angus or its predecessor had to be removed during the installation of the 16" pipeline."

---

[8] The second example given by Glendora is "Consideration of another servitude agreement from another case for the purpose of determining the 'customs of the industry,'" citing to the district court's consideration of the *Terrebonne* servitude. *See* Part IV(A)(i)(1) (quoting relevant part from district court opinion). The district court did not consider the *Terrebonne* servitude for the purpose of determining the customs of the industry, but rather in the context of discerning the generally prevailing meaning of the term "replace." *See In re Katrina Canal Breaches Litig.*, 495 F.3d at 210 ("Dictionaries, treatises, and jurisprudence are helpful resources in ascertaining a term's generally prevailing meaning."). The third example is "Consideration of a rejected settlement offer from Angus to Glendora." Glendora cites to the district court's recitation of the facts and procedural history. There is no indication that the district court weighed this in any way in its analysis.

No. 14-30416

Regardless of whether the Agreement is ambiguous, it was improper for the district court to have considered this evidence. Glendora correctly points out that the court could not permissibly consider extrinsic evidence if the Agreement were truly unambiguous. *See Sims*, 956 So. 2d at 590. On the other hand, if the Agreement is ambiguous, it was improper for the court to resolve ambiguity against Glendora. *See Terrebonne*, 290 F.3d at 315. Furthermore, as Glendora notes, the record does not support the conclusion that the older pipes found on the property were also put into place by others who held servitudes on the property.

The record includes extrinsic evidence that supports the idea that the Agreement did not include the right to abandon the older pipeline. Glendora argues that the court should have considered another servitude between Angus and Glendora, which explicitly included the right to abandon. Viewing this most favorably to Glendora, the servient estate, the inclusion of the right to abandon in a subsequent agreement indicates an acknowledgement that the terms of the Agreement at issue here either did not include that same right to abandon, or at least was ambiguous as to whether the right to abandon existed. Glendora also points to Angus's internal documents that give the impression that Angus believed it did not have the right to abandon the pipeline, such as an "Assumption & Clarification" from a 2010 capital cost estimate prepared by Mustang Engineering that "[d]ue to the existence of the single line right, which will continue to be utilized, Angus/Dow will be required to obtain new servitudes for the installation of the 16 inch pipeline." Thus, we conclude that the district court improperly considered extrinsic evidence in ruling on the motions for partial summary judgment.

Considering this matter in the light most favorable to the non-movant, we conclude that there is ambiguity in the Agreement as to whether the right to "replace" a pipeline includes an obligation to remove the older pipeline that

12

is being replaced. Recognizing that a genuine dispute of material facts exists, we VACATE the district court's grant of partial summary judgment to Angus as to this issue. *See Amoco Prod. Co.*, 180 F.3d at 669 ("[O]nly when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment.").[9]

### ii. Whether Angus is Operating and/or Maintaining Two Pipelines in Violation of the Agreement

Turning to Glendora's alternative argument that Angus is now operating and/or maintaining two pipelines, Glendora generally argues that the district court improperly expanded the Agreement's language of "a pipeline" and "the pipeline" to allow it to have multiple pipelines. The district court noted that "[i]t is undisputed that wastewater from Angus flows through only one pipeline—the 16" pipeline—, [sic] and it is further undisputed that the 12" pipeline was cleaned and capped." On this basis, the court concluded that Angus was not "operating" two pipelines, though without defining the term.

The most applicable definitions of "to operate" are:

*Merriam-Webster*:

> 2    a: to cause to function: work
>       b: to put or keep in operation[10]

---

[9] At oral argument, there was considerable discussion relating to the Agreement's grant of a "right to construct[] . . .a pipeline" (singular) and the fact that Angus appears to have constructed two pipelines when it constructed the substitute 16" pipeline and left in place the 12" pipeline. This proposition was not presented in the briefs on appeal in connection with this ambiguity issue, nor was it presented as a separate argument to the district court or this Court as a theory by which Angus committed a trespass or breached the Agreement. Accordingly, this does not inform our opinion, and we do not express an opinion on the matter.

[10] *Operate Definition*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/operate (last visited Mar. 4, 2015).

No. 14-30416

*American Heritage Dictionary*:

> 1. To control the functioning of; run: *operate a sewing machine*.[11]

The district court noted that speculation that Angus might remove the caps on the 12" pipeline at some point in the future and use the 12" pipeline does not mean that Angus is currently in breach of the Agreement. Applying these definitions, given that the 12" pipeline is no longer functioning but is rather just sitting underground, we also conclude that Angus is not operating two pipelines.

The most applicable definitions of "to maintain" are:

*Merriam-Webster*:

> 1: to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline <*maintain* machinery>[12]

*American Heritage Dictionary*:

> 2. To keep in an existing state; preserve or retain: *maintain one's composure*.
> 3. To keep in a condition of good repair or efficiency: *maintain two cars*.[13]

The district court found that "preserve from failure or decline" was the applicable definition, and then found that "there is no indication Angus has in fact done anything to preserve the 12" pipeline from failure or decline by abandoning and capping it." With no further action done to the pipeline, we also conclude that Angus is not preserving the 12" pipeline from failure or decline and thus not maintaining it.

---

[11] *Operate Definition*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2014), https://ahdictionary.com/word/search.html?q=operate (last visited Mar. 4, 2015).

[12] *Maintain Definition*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/maintain (last visited Mar. 4, 2015).

[13] *Maintain Definition*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2014), https://www.ahdictionary.com/word/search.html?q=maintain&submit.x=45&submit.y=33 (last visited Mar. 4, 2015).

Glendora argues that the district court improperly rejected evidence that confirms that the 12" pipeline was intended to be used, and is being used, as a backup to the 16" line. However, we conclude that the terms "operate" and "maintain" are clear such that we need not consider this evidence. Applying the accepted definitions of the terms "operate" and "maintain," we conclude that, at the present time, Angus is neither operating nor maintaining two pipelines. Nevertheless, as previously set forth, because we find ambiguity concerning the term "replace," we VACATE the grant of partial summary judgment to Angus as to this issue.

### B. Whether the Agreement Allowed Angus to Install Fiber Optic Cables

The terms of the Agreement that described other equipment that could be installed along with a pipeline were: "*incidental* equipment and appurtenances, either above or below ground, including but not limited to filtering devices, valves, meters, drips, and other *necessary and convenient* installations." (emphasis added). As the district court noted, "[a]lthough the fiber optic cables are not currently connected, they will give Angus the ability to control the flow and pressure of the wastewater traveling through the 16" pipeline." On this basis, the court concluded that "[u]nder the broadly worded language of the Right-of-Way Agreement, this installation is permissible, whether viewed as 'incidental' or 'necessary and convenient.'"

Glendora claims that the fiber optic cables were installed to perform functions not allowed by the Agreement. Glendora points out that the cables have not been connected or put into operation, and argues that they are thus neither necessary nor convenient. Angus's response is that this reading "redefines 'necessary and convenient' to be that which is currently installed."[14]

---

[14] In the alternative, Angus argues that the cables are proper under Louisiana Civil Code article 642, which defines the extent of the right of use granted in a servitude as "the

Angus has the stronger argument here. Just because the fiber optic cables are not connected does not mean that they would not be convenient if and when they are connected. Glendora emphasizes that the primary purpose of the fiber optic cables is to allow Angus to remotely operate the wastewater treatment plant from its main plant, while the only right Angus had was to operate a pipeline to transfer wastewater between the two plants. This does not change the fact, however, that the fiber optic cables would give Angus the *convenience* of controlling the flow and pressure of wastewater running through the pipeline with newer technology.

The Agreement is sufficiently clear as to this such that we need not consider the extrinsic evidence offered by Glendora. Instead, we conclude that the installation of fiber optic cables was proper under the Agreement and AFFIRM the district court's ruling as to this issue.

### C. Motion to Compel Discovery

The district court denied Glendora's motion to compel discovery, which seeks information regarding Angus's profits at the Sterlington plant, in light of its determinations with respect to the cross-motions for partial summary judgment. The court did not address Glendora's arguments about how the magistrate judge erred in denying the motion. Because of this, and because we are remanding the case on the basis of our determinations above, we also REMAND for the district court to reconsider the motion to compel. We express no opinion as to the motion.

### V. CONCLUSION

For the foregoing reasons, we VACATE the grant of partial summary judgment to Angus, AFFIRM the district court's holding that Angus had

---

rights contemplated or necessary to enjoyment at the time of its creation *as well as rights that may later become necessary*." LA. CIV. CODE ANN. art. 642 (emphasis added). However, the fiber optic cables are in no way necessary for the pipeline to be operated.

authority to install fiber optic cables, and REMAND for the district court to reconsider the motion to compel and for further proceedings consistent with this opinion.