# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-30186

DORE ENERGY CORP

Plaintiff - Appellee

v.

PROSPECTIVE INVESTMENT & TRADING CO LTD; ATLANTIC & GULF
PETROLEUM CO

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana

Before SOUTHWICK and HAYNES, Circuit Judges, and ENGELHARDT,
District Judge.[*]

Leslie H. Southwick, Circuit Judge:

The owners of the lease on which over twenty oil and gas wells were
producing were sued by the mineral owners in those wells. The wells were
scattered over a three square mile tract, which was all that was still subject to
the oil and gas lease that had been executed over eighty years ago on more than
10,000 acres. The longevity of the lease has led to disagreements and to
litigation. In 2002, earlier litigation was settled that left covered by the lease
only the three square miles involved in the current suit. The parties' 2002

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

agreement provided for the release of any of that remaining acreage that was not in producing units at the three-year anniversary of the settlement. In 2005, the mineral owners brought a new suit that alleged that the lease on all but one part of the three square miles had expired. The district court agreed, granting a summary judgment that canceled all of the lease except for one small part. The well operator, unsurprisingly, appealed.

We conclude that the fulcrum on which the outcome of this dispute turns is neither on the meaning of "producing unit" nor on whether the boundaries for each unit had to be established by the three-year anniversary of the settlement. Instead, the obligation under the 2002 settlement agreement for all parties first to negotiate in good faith on forming producing units, then to seek a state regulatory order if negotiations failed, simply needs to be enforced. No forfeiture of the producing wells has occurred.

We therefore REVERSE and REMAND for further proceedings.

## I. BACKGROUND

In 1927, landowner Cameron Meadows Land Company granted an oil, gas, and mineral lease to H.M. Henshaw on land located in Cameron Parish, Louisiana. Originally, 11,540 acres were covered by the lease. At the most, three square miles, or about 1,920 acres, are still subject to the lease. At the least, which is what the district court found, only about 160 acres still are.

Soon after receiving the 1927 lease, Henshaw executed what is usually called an assignment to Vacuum Oil Company, retaining an overriding royalty interest in the lease. We will discuss below that in Louisiana this kind of conveyance may be characterized as a "sublease." Henshaw's overriding royalty interest is now held by 115 individuals, approximately 30 of whom are Louisiana citizens. Through what used to be called *mesne* conveyances, as well as assignments and mergers, the leasehold or lessee rights became owned in 1999 by the Defendants, Prospective Investment & Trading Company and the Atlantic

and Gulf Petroleum Company. Prospective is the operator of the wells at issue. We will refer to both Defendants as the lessees or lease owners.

In 1995, Plaintiff Doré Energy Corporation purchased the land and mineral rights in Cameron Parish. Doré thereby acquired the lessor's rights, those initially owned by Cameron Meadows, under the 1927 lease.

The oil and gas lease provided for an initial term of years for exploration, but also provided that it would continue as long as oil and gas were produced in paying quantities from anywhere on the land. That long-ago lease did not contain the later common limitation that after an initial primary term, the lease would continue only as to the leased acreage within units surrounding producing wells. Even in the absence of a specific lease term, obligations of basic fairness have been imposed on the holders of oil and gas leases, including a covenant of further exploration after an original productive well is drilled. 5 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 841 (2006).

When Doré purchased the land in Cameron Parish, much of it was not producing oil and gas. It is alleged and perhaps conceded that no new wells on the leasehold had been drilled for many years. Under Louisiana law, "the main consideration of a mineral lease is the development of the leased premises for minerals, and that the lessee must develop with reasonable diligence or give up the contract . . . ." *Carter v. Ark. La. Gas Co.*, 36 So. 2d 26, 28 (La. 1948). Relying on such principles, Doré filed suit in 2000 against the lease owners seeking cancellation of undeveloped portions of the lease. That earlier suit was removed to federal court on diversity grounds. An argument made now was not raised by the lease owners then, namely, that the overriding royalty interest owners were indispensable parties.

On January 28, 2002, Doré and the lease owners entered into a settlement agreement. As part of the settlement, the lease owners agreed to release their interest in all of the land except for the part covering three specific sections of

land down to a depth of 10,500 feet. This excepted property is referred to as the "Retained Area," and it is the subject of the current dispute. We have earlier referred to the acreage as being three square miles.

The settlement agreement provided that three years later, those parts of the Retained Area that were not then in "producing units" would be released:

> 11. [Prospective] and Atlantic agree: To execute a Partial Release (i) as to all acreage within the Retained Area which is not at that time in producing units three years from the effective date of this Agreement, and (ii) as to all depths below the deepest producing horizon as of three years from the effective date of this Agreement. Doré and [Prospective] shall, in good faith, attempt to negotiate the size and extent of such producing unit or units before instituting a proceeding before the Louisiana Commissioner of Conservation. Doré, [Prospective], and Atlantic agree that under no circumstances shall any unit around any producing well bore in the Retained Area be less than 160 acres.

As part of the settlement, Doré agreed to dismiss its lawsuit with prejudice. The lease owners released the non-Retained Lands.

In 2002, when the settlement agreement was executed, there were 25 producing wells in the Retained Area that at some point in their past had been in units designated by the Louisiana Commissioner of Conservation. Some of those wells apparently were still producing from such units. On January 28, 2005, three years after the effective date of the settlement agreement, 25 producing wells existed in the Retained Area. Each well was still producing from the same well bore as it had been in 2002, but not all were producing at the same depth. Neither party has alleged it to be significant, and thus we have not determined from the record how many of the 25 wells producing in 2002 had by that date already been recompleted into shallower zones than those specified in the Commissioner of Conservation's unit designations. It does not appear that many of those recompletions occurred in the 2002-2005 period. What is

4

supported by the record is that only one well on January 28, 2005, was still producing from the depth identified in its unit designation; 24 were not.

According to one of the exhibits, much of the Retained Area contains no wells at all. The settlement agreement set 160 acres as the minimum size for a unit, which is one fourth of a standard governmental section of land. One of the sections of land in the Retained Area has wells on only one half of its territory; another section contains only one well; the final section has wells in only one of its quarter sections.

In March 2005, Doré sent letters to the lease owners demanding that they surrender the lease to all acreage that was not in producing units. This included the land containing the 24 wells that were no longer producing from the same depth as the respective units specified by the Commissioner of Conservation. The lease owners refused. They offered to negotiate with Doré regarding the shape and configuration of units around the producing wells. Instead of pursuing negotiations, Doré filed suit in Louisiana state court in September 2005 seeking enforcement of the 2002 settlement agreement. The case was removed to federal court. After discovery, Doré filed a motion for partial summary judgment seeking termination of the lease except for the one unit established by the Commissioner of Conservation that was still producing. The lease owners filed a cross-motion for summary judgment arguing that they were entitled to retain their producing wells and at least 160 acres around each producing well bore.

In September 2007, the district court granted partial summary judgment in favor of Doré. It found that Doré and the lease owners had not formed any voluntary units between 2002 and 2005, and neither party had requested that the Commissioner of Conservation form new units. Therefore, the only unit that satisfied the terms of the 2002 settlement was the one still producing under the

earlier unit designated by the Commissioner of Conservation. The district court canceled the lease on the rest of the Retained Area, effective January 28, 2005.

Shortly after the district court granted partial summary judgment to Doré, the lease owners filed a motion to dismiss for failure to join indispensable parties. This was the first time the argument was made that indispensable parties were absent. The lease owners argued that the overriding royalty interest owners were indispensable. Because some of the royalty owners are Louisiana citizens, this would destroy diversity. The district court denied the motion. On the day this motion was argued, Doré entered an agreement with the existing overriding royalty interest owners that, should their interests under the 1927 lease be canceled, they would be granted identical rights under any new lease on the same property.

The district court certified for interlocutory review the partial summary judgment and the order denying the motion to dismiss for failure to join indispensable parties. We granted review of both under 28 U.S.C. § 1292(b).

## II. DISCUSSION

### A.  *Summary Judgment Motion*

We review a district court's grant of summary judgment *de novo*. *Mahaffey v. Gen. Sec. Ins. Co.*, 543 F.3d 738, 740 (5th Cir. 2008). Summary judgment is proper when the evidence shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In determining whether there is a genuine issue of material fact, we view facts and inferences in the light most favorable to the nonmoving party." *Mahaffey*, 543 F.3d at 740. The parties do not dispute that Louisiana law applies to this diversity action.

#### 1.  *Section 11 of Settlement Agreement*

The district court canceled almost all the remaining portions of the lease. In making that judgment, the court relied on section 11 of the 2002 settlement

agreement, finding it unambiguously to require that result. All parties begin with the argument that section 11 is unambiguous and should be construed in their favor. The lease owners argue in the alternative, though, that section 11 is ambiguous, and the case should be remanded because of fact questions.

We restate the settlement language that is at the core of our dispute. The 2002 agreement required the lease owners to release that "acreage within the Retained Area which is not at that time in producing units three years from the effective date of this Agreement," including releasing all "depths below the deepest producing horizon as of three years from the effective date of this Agreement." Whatever might be ambiguous, the rights to maintain the lease as to acreage and depths were certainly to be set by production on the third anniversary of the settlement. The date of January 28, 2005, was the invariable point at which production from wells had to be occurring.

There are other relevant statements in the settlement. Before we add them to the analytical mix, we seek an understanding of the contract interpretation rules under Louisiana law that we are to apply. A settlement agreement is a contract. The rules of construction applicable to contracts are therefore used. *Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So. 2d 1096, 1106 (La. 2005); *see also* La. Civ. Code Ann. art. 3071. The ambiguity of a contract is a legal question. *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007). If the answer to the legal question of ambiguity is in the negative, then interpreting that unambiguous contract is also a legal issue for the court. *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).

Louisiana had adopted several statutory rules for interpretation of contracts. We find some relevant guidance in each of the following sections of the Louisiana Civil Code:

7

Art. 2045. Determination of the intent of the parties
Interpretation of a contract is the determination of the common intent of the parties.

Art. 2047. Meaning of words
The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

Art. 2048. Words susceptible of different meanings
Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.

Art. 2049. Provision susceptible of different meanings
A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.

Art. 2050. Provisions interpreted in light of each other
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

Art. 2053. Nature of contract, equity, usages, conduct of the parties, and other contracts between same parties
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

In summary, we are seeking the parties' intent. Technical words are given their technical meaning, but choices among doubtful definitions are resolved by applying the one that renders the contract effective and best conforms to its object. An outer boundary in interpretation is to avoid "unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit." *Tex. E. Transmission Corp.*, 145 F.3d at 742.

We now turn to a key phrase in the settlement agreement, "producing unit." That term is not defined in the agreement or under Louisiana law.

8

However, "producing" usually means the actual production of minerals in paying quantities. *See Menoah Petroleum, Inc. v. McKinney*, 545 So. 2d 1216, 1220 (La. 1989). A "unit" is the area defined by acreage and perhaps by depth to which the obligations and benefits of oil and gas exploration will be shared among the owners of the relevant interests:

> an area of land, deposit, or deposits of minerals, stratum or strata, or pool or pools, or a part or parts thereof, as to which parties with interests therein are bound to share minerals produced on a specified basis and as to which those having the right to conduct drilling or mining operations therein are bound to share investment and operating costs on a specified basis. A unit may be formed by convention or by order of an agency of the state or federal government empowered to do so. A unit formed by order of a governmental agency is termed a "compulsory unit."

La. Rev. Stat. Ann. § 31:213(6).

The district court combined these two definitions. It held that producing unit unambiguously means "an area of land formed voluntarily or with the Louisiana Department of Conservation that produces minerals in paying quantities." Doré accepts the district court's definition. It also accepts the result the district court reached using that meaning. Apparently every producing well would initially have complied with the district court's definition. It is our understanding, though, that all but one of the wells had through the years been recompleted at a shallower depth, allowing production to resume but without new unit designations being made. Doré asserts that a unit formed in Louisiana by convention or by government order would designate a depth to which the well would produce. Though the same well bores were producing from the same surface sites, only one well was producing from the depth identified in an approved unit. The failure to make the production units conform to the producing depths is what the district court relied upon in finding that by operation of the settlement, all but the one well had been forfeited.

9

The lease owners object. They argue that the prevailing industry definition of unit is "the acreage allocated to a specific well." *See* 8 WILLIAMS & MEYERS, *supra*, at 1107 (definition of "unit"). Ironically, the definition the lease owners pull out of the treatise is the second one listed. The first is taken from the Louisiana statute we already quoted, Section 31:213. *Id.* The lease owners also draw from the remainder of section 11 of the settlement agreement to explain the effect of the obligation to designate units:

> Doré and [Prospective] shall, in good faith, attempt to negotiate the size and extent of such producing unit or units before instituting a proceeding before the Louisiana Commissioner of Conservation. Doré, [Prospective], and Atlantic agree that under no circumstances shall any unit around any producing well bore in the Retained Area be less than 160 acres.

The lease owners argue that section 11 of the settlement agreement gives them at a minimum a lease to 160 acres around each of the 25 wells that was producing at any level above 10,500 feet on January 28, 2005.

We agree with the district court that producing units are those that produce minerals in paying quantities. We also agree that the settlement agreement does not distinguish between units created voluntarily or those formed by the Louisiana Conservation Commission.

More uncertain is the district court's additional requirement that for any unit that once had a well producing from one depth, then was recompleted and was now producing at a different depth from the same well bore, a new unit designation reflecting the new depth had to be obtained. There has been little effort by Doré to demonstrate that the designation by depth is legally required, but the lease owners have not shown the opposite. Based on this record and the parties' arguments, which do not direct us to clear legal authority on this point, we find it reasonable to define "producing unit" to include a designation of the depth of the formation into which the well is completed.

After defining the term, the district court concluded that because successor units had not been created by agreement or governmental order to reflect the new depths from which production was occurring, there was only one producing unit remaining on the lease on the third anniversary of the settlement. Therefore, the lease on all but one unit in the Retained Area was canceled, and the producing wells were forfeited.

Our judgment of where to proceed from the definition differs from that of the district court. It is true that the settlement agreement set January 28, 2005, as the point in time at which to determine what parts of the lease would continue. As to any acreage outside and the geological formations below a producing unit, a release was to be executed. The history of this and predecessor litigation indicates the importance to the mineral owner of those releases, as freeing land from the hoary hand of the 1927 oil and gas lease and its outdated terms is likely what has driven all this controversy. How that deadline and the requirement of unit designations relate is our next issue.

We move back one step to gain perspective. All the parties and the district court state that these terms in the settlement were unambiguous. Doré and the district court concur that the agreement unambiguously required reformed units on the long-producing wells as of the third anniversary. The lease owners allege the agreement did no such thing. Instead, it unambiguously allowed the producing wells to hold at least 160 acres per well even after the deadline. The lease owners stand ready to enter into such negotiations now.

Our problem with these inconsistent notions of unambiguous meaning is that they rely on dueling versions of what the three-year deadline covers. Doré says it applies to everything. There needed to be production from wells, negotiations concluded or governmental orders obtained on the configuration of the producing units, and releases executed. As to the lease owners, they argue that the lease is continued as to 160 acres around each well that was

11

producing in paying quantities on January 28, 2005. The configuration of those 160-acre units is something that remains susceptible to negotiation or governmental order.

After considering all that we have discussed, we conclude that no relevant term in the 2002 agreement was legally ambiguous. There was, though, an important indefinite term. The indefiniteness concerned the deadline for when the formal unit designations had to be made. Louisiana law gives definition by presuming a reasonable time for a party to act. We explain our reasoning by examining different segments of the three sentences.

The first sentence of the relevant paragraph of the settlement required a partial release to be executed as to all acreage outside and depths below the units that were producing on the designated 2005 date.

In the second sentence, Doré and Prospective (but not Atlantic, who was not the operator of the wells) agreed to attempt to negotiate the configuration of the producing units and, failing that, would institute a proceeding before the relevant state official. Though both parties have the good faith obligation, we find merit to Doré's argument that the lease owners would have been the ones expected to initiate the negotiations. We also know from the agreement that the necessary units would consist of at least 160 surface acres and extend down to just below the producing formation.

The parties also agreed to "execute a Partial Release (i) as to all acreage within the Retained Area which is not at that time in producing units three years from the effective date of this Agreement, and (ii) as to all depths below the deepest producing horizon as of three years from the effective date of this Agreement." This provision sets a date certain by which to determine if there was production in a unit. Because of the next sentence, we do not find that it clearly sets a date certain for when the unit had to be officially formed.

"Doré and [Prospective] shall, in good faith, attempt to negotiate the size and extent of such producing unit or units before instituting a proceeding before the Louisiana Commissioner of Conservation." Both parties had an obligation to resolve their differences. The earlier litigation had been settled. All of the non-Retained Area acreage under the 1927 lease was relinquished by the lease owners. In the three sections of land that remained, all parties knew there were producing wells. Whether they knew that the formalities of the unit designations might be imperfect, it seems difficult to see from the language of the settlement that the lease owners were agreeing to abandon all producing wells for which some flaw in the unit designation might exist. Not given was any date by which the negotiations in good faith, which were to occur first, and any necessary turn to the regulatory authority if negotiations failed, were to be completed. Doré's argument is that the three-year mark must be the date.

We see the agreement differently. The fact that production had to be occurring on the third anniversary of the lease to hold acreage has to be read together with the obligation of the parties to attempt an agreement on the unit boundaries. There is no direct language that the acreage that would be held by each well would by the three-year mark have been agreed or imposed. Under Louisiana law, when the period for performance of some provision in a contract is indefinite, the obligation must be performed "within a reasonable time." La. Civ. Code Ann. art. 1778. We conclude that a reasonable time is what the parties, not just the operator of the wells, had to resolve any necessary reconfiguration of the unit designations.[1]

The last sentence in the paragraph was that "Doré, [Prospective], and Atlantic agree that under no circumstances shall any unit around any

---

[1] Because of our later determination that the proper remedy for any breach is the specific performance of the settlement agreement, it ultimately does not much matter whether the agreement required the unit reconfigurations to be accomplished by the 2005 date.

producing well bore in the Retained Area be less than 160 acres." What is unambiguous from this is that no well would hold a smaller segment of the lease than 160 acres. Thus the lease owners were entitled for every well producing in paying quantities on the applicable date, to hold at least 160 acres of the lease down to the depth of production – no ifs, ands, or buts. The spacing of the wells was such that apparently many of such 160-acre units would overlap in whole or in part. There were also, from our view of the evidence, large segments of those three sections that would not be held by 160-acre units. If the units that would be formed by agreement or by the Commissioner of Conservation were larger than 160 acres, then a higher percentage of those three sections would be held. The district court found that despite this undisputable right, the lease owners forfeited all but one 160-acre unit.

There is no ambiguity to any of this. The parties agreed that the lease owners would for three years retain the nonproductive acreage under the lease in the three sections of land, but at that anniversary date, the acreage would be lost. We find no agreement that the lease owners were taking the risk that if they had not taken the formal steps to reform old producing units into ones that identified the proper depth of production, they also would forfeit the portions of the lease being held by such wells.

Particularly useful here is the Louisiana Civil Code Article 2053, which provides that any questionable "provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." The purpose of the contract, and the equity behind it, both compel an interpretation that the settlement agreement was not a well-forfeiture agreement. It was an agreement to reduce the effect of the then-seventy-five-year-old lease to just that acreage and those depths that were

producing. There is no support that another object was to make formal unit designations override the fact of actual production.

For these reasons, we reverse the district court's order that the lease, except for that held by the one well, had been relinquished effective on January 28, 2005. The settlement agreement does not unambiguously or even with a little uncertainty lead to that result. As we point out later, any lingering doubt is removed by Louisiana law that forfeiture is to be avoided.

Of course, the lease owners not only failed to complete the steps needed for reforming units, they did not even begin them. Both parties had a good faith obligation to attempt to negotiate the size and extent of the producing units before taking the dispute over units to the Commissioner of Conservation. When the lease owners took no initiative to do that, they allowed the entirety of the three sections of land to remain under their control and not available for Doré's possible attempts to lease some acreage anew.

We indicated previously that the time to pursue negotiations or to turn to the Conservation Commissioner would be measured by reasonableness. Two months after the third anniversary date of the settlement, Doré demanded that the lease owners release all but the one well. We would ascribe largely but not completely to the lease owners the failure to initiate negotiations prior to the anniversary date, or even after that until the March 2005 demand from Doré. On the other hand, the fact that today, four more years have passed without any negotiations could be seen primarily as the result of Doré's insistence that the lease and the producing wells have largely been forfeited. We now turn to what the district court should do on remand.

### 2. *Proper Remedy*

We are deciding today that cancellation of the portions of the lease covering acreage on which a producing well was located was error. It is true that there is not complete clarity as to what land was held, because the unit

designations are not synchronized with the new producing depths. What is now uncertain can be made certain, though, and the effective date of the release of remaining acreage would be January 28, 2005.

If the lease owners breached the settlement, it was for the failure to commence negotiations within a reasonable time. If they committed that breach, the cancellation of the lease for that default is disfavored under Louisiana law. *See, e.g.*, *Tolar v. Spillers*, 2 So. 2d 560, 563-64 (La. Ct. App. 2009); *Atkinson v. Richeson*, 393 So. 2d 801, 803 (La. Ct. App. 1981). In Louisiana, "a lease will be dissolved only when it has been shown that the lessor is undoubtedly entitled to such a cancellation." *Atkinson*, 393 So. 2d at 803. Moreover, the breach must be shown to be substantial to dissolve a mineral lease. *Tassig v. Goldking Props. Co.*, 495 So. 2d 1008, 1018 (La. Ct. App. 1986).

Under Louisiana law, "specific performance is the preferred remedy for breach of contract." *J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So. 2d 896, 897 (La. 1981); *see also Bourgeois v. Dunn*, 822 So. 2d 708, 711 (La. Ct. App. 2002). Indeed, specific performance may be mandated unless it is impracticable. When an obligor fails to perform an obligation to "deliver a thing" in Louisiana, "the court shall grant specific performance plus damages for delay if the obligee so demands." La. Civ. Code Ann. art. 1986.

Though the lease owners have not used the phrase "specific performance," they have continually maintained that they are willing to negotiate with Doré regarding the shape of the units around each well. The lease owners contend that they should retain each producing well plus 160 acres surrounding each producing well, but they do not argue that they should retain any nonproducing acreage. We find that the lease owners have recognized that enforcing the agreement to designate units is the proper relief. Indeed, the lease owners recognized as much when they stated in their reply brief that a proper award enforcing the settlement agreement would be an order forcing the parties to

16

negotiate the extent of the producing units or to initiate proceeding before the Commissioner of Conservation.

There are no doubt various issues for the district court to consider in the remand. We identify a few to indicate what we are not resolving. We are not finding that the settlement agreement was breached by the failure of the lease owners to commence good faith negotiations before suit was filed. It is of some importance that Doré also was to "attempt to negotiate the size and extent of such producing unit," which suggests that having the configurations set was to the parties' mutual advantage. Doré has argued that not having the units was to their advantage, since they would – and the district court agreed – gain these producing wells and the chance to enter new leases on extraordinarily favorable terms. Yet we find nothing in the agreement to suggest that the usual Louisiana rules for not ordering lease cancellations or forfeitures of such valuable property as producing wells was being overridden. Instead, the obligation on the mineral owners also to negotiate is a recognition that establishing the units would benefit them by allowing nonproductive acreage and depths to be released.

On remand, the district judge should consider whether the failure to begin negotiations for reforming any producing units before the suit was filed was a failure to act within a reasonable time under the settlement, and if so, whether the lease owners alone are responsible. The remedies available under Louisiana law and by these pleadings for such a breach do not include forfeiture. The court can determine the best means to enforce the obligations under the settlement to form the new units.

## B.  *Indispensable Parties Motion*

In the district court, the lease owners moved to dismiss Doré's complaint for failure to join indispensable parties. *See* Fed. R. Civ. P. 12(b)(7). These allegedly necessary parties are the overriding royalty interest owners whose

rights to payment from production is derived from the lease that the suit would largely cancel. Federal Rule of Civil Procedure 19 allows both for the joinder of parties who should be present in order to have a "fair and complete resolution of the dispute," and for the dismissal of lawsuits "that should not proceed in the absence of parties that cannot be joined." *HS Res., Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003) (citations omitted). The lease owners argued that the overriding royalty interest owners are indispensable and acknowledged that because many are Louisiana residents, diversity jurisdiction would be at an end. The motion was denied.

We review the denial of such a motion for possible abuse of discretion. *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 393 (5th Cir. 2006). Because this suit is in federal court based on diversity jurisdiction, we apply Louisiana substantive law and federal procedural law.

The district judge issued a separate memorandum ruling on the indispensable parties motion. The initial and fairly brief finding was that the only indispensable parties in this suit over the meaning of the settlement agreement were those who executed it. It was not put in these terms by the district judge, but the point could be extended by noting that the settlement agreement had already affected the overriding royalty owners by releasing substantial acreage from the lease in 2002, and setting up a process to release more in 2005. It did seem a bit late in the day to become aware of their interests.

The district court spent much more time in the ruling on the delay in bringing this issue before the court. The court found that discretion existed in ruling on the motion. Unreasonable delay and even bad faith were found to exist in the lease owners' filing of the motion only after partial summary judgment was entered against them.

On appeal, there are lengthy discussions in the briefs on various facets of this issue. We find most of them unnecessary to engage. The basic question is whether this suit affects any rights of the overriding royalty owners. Their interests have been similarly affected by every cancellation of parts of the lease through the years. In previous litigation, the right of the lease owner to release acreage without the consent of the overriding royalty owners was contested. *Cameron Meadows Land Co. v. Bullard*, 348 So. 2d 193 (La. Ct. App. 1977). In analyzing the issue, the court concluded that the assignment of the lease and retention of an overriding royalty was a sublease under Louisiana law. *Id*. at 198. Nonetheless, the court found that the "sublease" from Henshaw in 1927, shortly after the oil and gas lease was executed, granted to the sublessors/assignees the right to release acreage without the approval of Henshaw or his successor owners of the overriding royalty interests:

> We construe the 1927 sublease agreement, in light of its provisions and the actions of the parties thereunder for a period in excess of 43 years, and conclude that it was clearly the intention of the parties thereto that the Sub-lessee, its successors or assigns, was granted the right thereunder to effectively release all or any part of the leased acreage.

*Id*. at 199. The court went on to hold that any overriding royalty interests in the released portions of the land were terminated. *Id*. at 200.

Another much more recent case cited to us also concerns this same lease. *See Doré Energy Corp. v. Carter-Langham, Inc.*, 997 So. 2d 826 (La. Ct. App. 2008). The court found that a jury could have reasonably concluded that the predecessors to the current lease owners held an assignment, not a sublease. Under the 1977 *Bullard* decision we just discussed, the court had already held that a sublessee under this lease could release land without the overriding royalty owners' consent. Under Louisiana law, an assignee acquires all the rights of the lessee, which would include the right to surrender parts of the

lease. *See* La. Rev. Stat. Ann. § 31:128. Therefore, regardless of whether this is a sublease or an assignment, the lease owners can surrender the leased land without it reverting back to the overriding royalty interest owners.

Such a ruling certainly suggests that the overriding royalty interest owners, subject to the unchallengeable decision making by the lease owners on whether to release or not, could not sue to block enforcement of a settlement agreement by the lease owners to execute releases. The somewhat different question here is whether, when the lease owners are being sued by the mineral owners to cancel most of the remaining portion of the lease, the overriding royalty owners have a right to participate in presenting the argument that the lease is still in effect to the maximum defensible degree. Such a role is not challenging the discretion of the lease owners. It is a participation alongside them in defending the lease.

Such nice points of distinction will not affect our resolution. Regardless of whether there is some legitimacy to the lease owners' argument, the reality is that joinder of the overriding royalty interest owners would deprive the federal court of diversity jurisdiction. *See* Fed. R. Civ. P. 19 (a)(1). When joinder of a required party is not feasible, the district court must consider "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id*. at 19(b). Among the factors listed in the rule for consideration are whether the absence of the identified parties would prejudice either them or the litigants, and whether a judgment entered with the existing cast of parties would be adequate. *Id*. at 19(b)(1), (3).

Apparently in an effort to remove this issue, Doré entered an agreement that purports to be with all the overriding royalty interest owners. It provides that should any additional acreage under the 1927 be released, Doré agreed that the current overriding royalty interest owners would continue to be entitled to the same payments out of production. In effect, the overriding

20

royalty interest owners no longer even have a stake in the outcome of this litigation, regardless of whether they have a legal right to participate.

The lease owners argue that Doré has attempted to "paper over" a defect in federal jurisdiction arising from the absence of the overriding royalty interest owners in the case. We find no bar to a party's eliminating, even with paper, an issue such as this. The factors under Rule 19(b) are concerned with whether actual harm to anyone's interests will occur if the case proceeds absent certain parties. This papering over removed any possible actual financial impact on the overriding interest owners.

We find no abuse of discretion in denying the motion to join these parties.

III. CONCLUSION

We reverse the lease cancellation and the award of production from the wells subject to that cancellation. We affirm the denial of the motion to join other parties.

On remand, the district court should determine whether the lease owners breached the obligation in the settlement agreement to negotiate the new unit configurations in good faith. Regardless, the court should address with the parties the best means to assure performance under the settlement of the obligation to create formal units appropriate to the producing wells.

The district court's grant of partial summary judgment is REVERSED, and the case is REMANDED for proceedings consistent with this opinion.