# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 16, 2010

No. 09-31122

Lyle W. Cayce
Clerk

APACHE CORPORATION,

Plaintiff - Appellant,

v.

W & T OFFSHORE, INC.,

Defendant - Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, PRADO, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Although the parties submitted over one-hundred pages of briefing, the issue on appeal is the same straightforward question of contract interpretation previously before the district court: Does the Farmout Agreement[1] require W&T to bear a proportionate share of the costs of decommissioning an oil platform

---

[1] A farmout agreement is "[a] very common form of agreement between operators, whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it (in common or in severalty) to another operator who is desirous of drilling the tract. The assignor in such a deal may or may not retain an overriding royalty or production payment. The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to completion of the transfer to him." Howard R. Williams & Charles J. Meyers, Manual of Oil & Gas Terms 389 (9th ed. 1994).

No. 09-31122

located on the federal offshore oil and gas lease designated OCS-G 2951 Main Pass Block 151 (Block 151). Because we agree with the district court that the unambiguous language of the Agreement does not create any such obligation, we AFFIRM.

## I.

W&T's predecessor in interest, the Atlantic Richfield Company (ARCO), and Apache's predecessor in interest, the Texoma Production Company (Texoma), executed the Farmout Agreement on October 31, 1979. Texoma then had thirty days to commence drilling a test well, which if successful, earned Texoma an assignment of ARCO's interest in the OCA-G 2950 Main Pass Block 148 (Block 148) lease subject to an overriding royalty interest. ARCO's relatively small overriding royalty interest was free of any obligation to contribute to the costs of production.

The Farmout Agreement, however, included two election points for ARCO to convert its 8.33 percent overriding royalty interest into a 33.3 percent cost-bearing working interest. Generally speaking, the first election point allowed ARCO to convert its royalty interest in the first well while the second election point allowed ARCO to convert its royalty interest in any subsequent wells. The first election point would occur after Texoma recovered "the proportionate costs of drilling, testing, completing, equipping, and operating the well, including that portion of the platform costs which shall be allocated to such well on the basis of the number of slots on the platform." The second election point would occur only if Texoma proposed to drill a second well prior to recovering its production costs in the first well. If Texoma proposed a second well, ARCO would have thirty days to convert its overriding royalty interest in the second well into a working interest and participate in the drilling of the second well. Upon conversion under the second election point, ARCO would be "responsible for the proportionate share of the platform costs allocated to the total number of wells

2

to be drilled for production from said lease under the plan of exploration and development." ARCO exercised both options to convert its royalty interest to a working interest, and pursuant to the Farmout Agreement, the parties entered into a joint operating agreement (JOA) governing the operations of the Block 148 lease.

No drilling platform was ever constructed on Block 148. Apache, however, operated the Block 151 platform, which served both the Block 151 lease and the adjacent Block 148 lease until Hurricane Ivan damaged the platform in 2004, thereby ending its service life. Because federal regulations require leaseholders to remove and decommission oil and gas platforms at the end of their service life, Apache, as the platform operator, began the process of decommissioning the Block 151 platform. Apache sought reimbursement for such costs from W&T, contending that the Farmout Agreement requires W&T, which owns a 33.3 percent working interest in Block 148, to pay a proportionate share of the decommissioning expenses. W&T refused to pay.

Accordingly, on November 25, 2008, Apache filed a complaint in the United States District Court for the Eastern District of Louisiana (1) seeking a declaratory judgment that W&T must bear its proportionate share of the total costs of decommissioning and abandoning the Block 151 platform, (2) alleging that W&T's refusal to bear its proportionate share of the decommissioning costs constitutes a breach of the Farmout Agreement, and (3) alleging, in the alternative, that "W&T has enjoyed the use of the [Block 151 platform] to its enrichment without cause at the expense of Apache." W&T counterclaimed, seeking indemnity under the Farmout Agreement. Prior to completing discovery, Apache sought summary judgment "holding W&T liable for its proportionate share of [Block 151 platform] costs, including decommissioning costs," and dismissal of W&T's counterclaim with prejudice. W&T subsequently filed a cross-motion for summary judgment seeking dismissal of Apache's

complaint, indemnification, and attorneys' fees. The district court concluded that

> The Farmout Agreement could have required ARCO to agree to pay a share of the decommissioning costs of the platform located on Block 151 but it did not. Nowhere in either the Farmout Agreement or the subsequent JOA is an obligation expressed to pay for the decommissioning of that platform. Apache cannot meet its burden of proving such an obligation exists because the unambiguous language of the agreements does not create one.

Moreover, with respect to W&T's indemnity claim, the district court found that "[t]here is nothing in the text to suggest that ARCO was attempting to shift the costs of a subsequent litigation between the parties to the agreement." Accordingly, the district court denied Apache's summary judgment, granted W&T's summary judgment in part, and dismissed Apache's complaint and W&T's cross-claim for indemnification and attorneys' fees with prejudice.

## II.

We review the district court's summary judgment *de novo*, applying the same legal standards used by the district court.[2] *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citation omitted). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)(2)). "[T]he court views all facts and evidence in the light most favorable to the non-moving party," and "[m]ere conclusory allegations are insufficient to defeat summary judgment." *Id.* (citations omitted). Furthermore, "where the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no

---

[2] The parties dispute the appropriate standard of review but are both incorrect because they ignore the procedural posture of this case, which is a review of the district court's summary judgment.

genuine issue of material fact can exist. *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## III.

## A.

The Outer Continental Shelf Lands Act "vests the United States with jurisdiction over the soil and seabed of the oceans and artificial islands and fixed structures located thereon, and grants to the United States the mineral resources that are part of the [Outer Continental Shelf.]" *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 522 (5th Cir. 2000). Furthermore, the Act provides:

> To the extent that they are applicable . . . the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf . . . and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A). Because both Blocks 148 and 151 are adjacent to Louisiana, the law of Louisiana controls this court's interpretation of the Farmout Agreement.

Under Louisiana law, "interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. "In ascertaining the common intent, words and phrases in a [contract] are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 589 (La. 2007)) (internal quotation marks and citation omitted). Moreover, "[w]ords susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract," La. Civ. Code Ann. art. 2048,

and "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole," La. Civ. Code Ann. art. 2050.  In addition, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046.  Thus, "[u]nder Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc.*, 180 F.3d 664, 668 (5th Cir. 1999) (citing *Tex. E. Transmission Corp. v. Amerada Hess Corp.,* 145 F.3d 737, 741 (5th Cir. 1998)).  Accordingly, this case turns primarily on whether the Farmout Agreement unambiguously requires W&T to pay for its proportionate share of the costs of decommissioning the Block 151 platform.

**B.**

Both parties claim that the Farmout Agrement is unambiguous but reach opposite conclusions as to whether W&T is obligated to pay its proportionate share of the Block 151 platform decommissioning costs.  This discrepancy does not, by itself, indicate that the contract is ambiguous.  *See Amoco Prod. Co.*, 180 F.3d at 668-69 (holding that "[a] contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight" (citation omitted)).  "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Id*. at 669.

Here, the Farmout Agreement is silent about decommissioning costs. Nevertheless, Apache contends that the term "platform costs" encompasses the costs of decommissioning the Block 151 platform.  "Platform costs" is used twice in Section VII, which governs ARCO's (W&T's predecessor) two election points for converting its overriding royalty interest into a working interest.  The first

No. 09-31122

use of the term is in the description of the first election point, which allows conversion of ARCO's royalty interest in the first well:

> The overriding royalty herein provided for shall be paid until such time as you have recovered out of the proceeds of production from the producing well after deducting the royalty, overriding royalty and taxes paid by you on production, as applicable to ARCO's contributed interest, the proportionate costs of drilling, testing, completing, equipping and operating the well, including that portion of the platform costs which shall be allocated to such well on the basis of the number of slots on the platform. The operating costs to be recovered shall be determined in accordance with the accounting procedure attached hereto as Exhibit "A". At such time as you have recovered the costs therein provided for, ARCO shall have 30 days, from the receipt of such notice of your recovery of said cost, within which to elect to convert its overriding royalty interest to a proportionate 33 1/3 percent working interest in the initial well, equipment in and on same, production from such well, and that portion of said lands included in any units.

Two paragraphs later, "platform costs" is used again in the description of the second election point, which allows conversion of ARCO's royalty interest in the second and subsequent wells:

> If prior to the payout of the first producing well, as hereinabove provided, you propose to drill the first development well provided for under the plan of exploration and development . . . you shall so notify ARCO in writing. . . . Should ARCO elect to participate in the drilling of such well it shall convert its overriding royalty to a 33 1/3 percent working interest in said lease and shall join in the hereinbefore described joint operating agreement and shall be responsible for its proportionate share of platform costs allocated to the total number of wells to be drilled for production from said lease under the plan of exploration and development. However, ARCO's election to participate as is set forth, shall not be deemed an election to convert its overriding royalty in the first producing well, which election, if so made, shall be as hereinbefore provided, i.e., at the time of payout of such first producing well.

Both election points can only occur upon the completion of certain preconditions. For example, the second election point can occur only if Texoma

7

elects to drill a second well (i.e., the first development well). If Texoma, for instance, had elected not to drill any development wells, this election point would never occur. Similarly, the first election point can occur only when ARCO has recouped certain expenses, including "platform costs," related to the initial producing well. Given this precondition, the term "platform costs" must refer to the costs of constructing the well platform and not to future decommissioning expenses that the operator may incur at some unknown time in the future.

Stated differently, if the term "platform costs" included the future expenses of decommissioning the Block 151 platform, W&T's election point to convert its royalty interest in the first well would not occur until after Apache had decommissioned the well. That is, under Apache's construction, decommission costs would not be recoverable until after the platform had been decommissioned, and once the platform had been decommissioned, it would be impossible to recover such expenses out of the proceeds of a well that is no longer operational. This construction is nonsensical. It would be pointless for ARCO to convert its overriding royalty interest into a working interest following the decommissioning of the Block 151 platform. Where there is no production, there are no royalties, regardless of the percentage.

Granted, it would be possible for this election point never to occur. For example, if the first production well failed to produce in sufficient quantities, this election point would never occur because Texoma would be unable to recoup its costs associated with this well. We will not, however, interpret a contract to render one of its provisions altogether meaningless. Here, the object of the elections is to provide ARCO with two opportunities to convert its overriding royalty interest into a working interest, and words "must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code Ann. art. 2048. Therefore, we find that the term "platform costs," as used

with reference to the first election point, refers only to the costs of constructing the platform.[3]

Under Louisiana law, we interpret the second usage of the term "platform costs" in light of the preceding use. *See* La. Civ. Code. Ann. art. 2050. Here, the two usages occur in the same section of the contract (Section VII), in the same context (election points), and mere paragraphs apart. Moreover, there are no modifiers attached to the second usage of "platform costs" to indicate a different meaning. Accordingly, we agree with the district court that "[i]n both instances, the term platform costs is in reference to the costs of constructing a well," and that "[n]either instance purports to control the management of expenses into the future."[4]

Furthermore, in that same section, the Farmout Agreement requires the parties to enter into a joint operating agreement (JOA) providing "provisions as may be necessary for the operation of the affected properties" upon the exercise of either election. This is further evidence that the term "platform costs" includes only fixed, startup costs of constructing a well, not speculative operational expenses, which are outside the scope of costs contemplated by the

---

[3] Although federal regulations specify that decommissioning obligations accrue when the platform is installed, 30 C.F.R. § 250.1702, this does not mean that the cost of such obligations is also realized at this time. The operator accruing the decommissioning obligations might never incur the costs. For example, the operator might have entered into a joint operating agreement with another party where that second party agreed to pay the entire costs of decommissioning.

[4] Apache concedes that the term "'platform costs' means the same thing in both election clauses," but nevertheless maintains that the Farmout Agreement uses the term in two different contexts in order to achieve two different results. According to Apache, the first election point, unlike the second, reflects a "snapshot in time." That is, the first election point is triggered when Texoma achieves a "payout"—"a time when the value of the production from the well catches up with the well as defined by the parties." Apache, however, has abandoned this argument by failing to raise it in its initial brief on appeal. Accordingly, we need not consider it. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

No. 09-31122

election-point provisions.[5]   Simply put, Apache's construction of the term "platform costs"—that it includes "all costs attributable to the platform from cradle to grave, construction to dismantlement"—is unsupported by the Farmout Agreement.

Similarly, the JOA is silent as to the Block 151 platform, and neither party contends otherwise.  The Block 148 JOA specifically defines the extent of the parties' obligations for regulatory decommissioning and platform removal, including hypothetical future platforms on Block 148, but does not even mention the Block 151 platform.  Accordingly, the JOA does not require W&T to pay to decommission the Block 151 platform.  Therefore, we find that neither the Farmout Agreement nor the JOA requires W&T to pay to decommission the Block 151 platform.

Moreover, to the extent Apache argues that W&T owns an interest in the Block 151 platform such that the law requires payment for decommissioning costs, this argument fails as contrary to Louisiana law.  Apache avers that W&T acquired an interest in Block 151 from its predecessor, Vastar, because the

---

[5] Apache also asserts that (1) "W&T's obligation to pay its proportionate share of platform costs was expressly made dependent on Texoma's development plan, so the provisions of that plan became part of the agreement between the parties," and (2) the plan of development and exploration "'called for Texoma to jointly develop and produce [the Block 148 and 151 leases] from a single drilling and production platform located on Block 151.'" Accordingly, Apache argues that W&T, as a party to the plan of exploration and development, is contractually required to pay for the costs to remove the Block 151 platform.  This argument is unpersuasive.   First, the parties dispute whether the Farmout Agreement actually incorporated the plan of development by reference, and indeed, an inspection of the Agreement indicates that it was not expressly included.  *See, e.g.*, *Russellville Steel Co. v. A&R Excavating, Inc.*, 624 So. 2d 11 (La. App. 5th Cir. 1993); *Action Fin. Corp. v. Nichols*, 180 So. 2d 81 (La. App. 2d Cir. 1965).  Second, as W&T notes, Texoma's plan of exploration and development "is not an agreement, and it creates no rights or obligations."  The plan of exploration and development was "nothing more than a report which Texoma was required to submit to the U.S. Geological Survey as the 'Operator.'"  So even if the parties fully incorporated the plan of exploration and development into the Farmout Agreement, it does not independently give rise to an obligation to pay for decommissioning costs.

10

assignment from Vastar to W&T specifically included all of Vastar's working interest in the Block 151 platform. This phrase, however, does not necessarily mean that Vastar actually owned rights in the Block 151 platform. Rather, it means that Vastar assigned whatever rights it happened to have in the Block 151 platform out of an abundance of caution. A party cannot assign what it does not own. *See Town of Homer v. United Healthcare of La., Inc.*, 948 So. 2d 1163, 1169 (La. App. 2d Cir. 2007) ("An assignor cannot assign any rights greater than that which he held." (citations omitted)).

In addition, the Block 151 platform, which was a drilling platform permanently affixed to the seabed, was an immovable under Louisiana law, *Bruyninckx v. Bratten*, 554 So. 2d 247, 249 (La. App. 3d Cir. 1989), and ownership of an immovable can be conveyed only by a written act translative of title. *See Oak Harbor Prop. Owners' Ass'n v. Millennium Grp. I, L.L.C.,* 934 So. 2d 814, 818 (La. App. 1st Cir. 2006). Here, neither the Farmout Agreement, nor the Block 148 JOA mention the Block 151 platform. Because neither document conveyed ownership of any interest in the platform to ARCO, such interest could not have passed to W&T. Because W&T owned no interest the Block 151 platform, federal law does not require W&T to pay decommissioning costs of the Block 151 platform. 30 C.F.R. § 250.1701(a) ("Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases, including the obligations related to lease-term pipelines, as the obligations accrue and until each obligation is met.").[6]

---

[6] Apache argues that the consequence of the district court's interpretation of the term "platform costs" "is that W&T has no obligation to pay any share of the millions of dollars it cost[s] to comply with the government regulations requiring the removal of the [Block 151 platform]. Although Appellant correctly notes that "[a]n outer boundary in interpretation is to avoid unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit," *Dore Energy Corp. v. Prospective Inv. & Trading Co.*, 570

No. 09-31122

Because Apache seeks to enforce a contractual obligation against W&T, it must first prove that the obligation exists. *See Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 58 (La. 2005); *see also* La. Civ. Code Ann. art. 1831 ("A party who demands performance of an obligation must prove the existence of the obligation."). Here, Apache has failed to meet its burden. We agree with the district court: "Apache cannot meet its burden of proving an obligation exists because the unambiguous language of the agreements does not create one." There is no choice of reasonable interpretations presenting a genuine issue of material fact that precludes summary judgment. *See Amoco Prod. Co.*, 180 F.3d at 669. Accordingly, we affirm the district court's summary judgment.

## C.

Apache also argues that the district court lacked authority to enter a final judgment dismissing all of Apache's claims. Apache contends that it moved for summary judgment only on its breach-of-contract claims and W&T's counterclaim for indemnity, and that "[n]either party moved for summary judgment on Apache's declaratory-judgment or enrichment-without-cause claims." Apache, however, misconstrues the record. W&T's cross-motion for summary judgment prayed for judgment "Dismissing Apache Corporation's Complaint" (as opposed to just the contractual claim). Moreover, W&T's

---

F.3d 219, 225 (5th Cir. 2009) (internal quotation marks and citation omitted), this is not such a case. In *Dore*, the court avoided interpreting a settlement agreement as a "well-forfeiture agreement." *Id.* at 229.

Here, however, the narrower construction of the term "platform costs" merely forces Apache to pay for decommissioning costs that federal law already obligated it to pay. Had ARCO never elected to convert its interest, Apache would have faced the decommissioning obligations alone. Thus, Texoma, Apache's predecessor, recognized the risk of paying decommissioning costs when it entered into the Farmout Agreement. When ARCO elected to convert its overriding royalty interest into a working interest, Texoma became obligated to pay a greater royalty (33 1/3% as opposed to 8.333%). This increased royalty, however, was balanced by ARCO's agreement to enter into a JOA and to pay certain operational expenses under the JOA. Although Texoma might have negotiated for decommissioning costs, it did not, and the deal struck hardly results in "unreasonable consequences or inequitable or absurd results." *Id.* at 229.

12

No. 09-31122

memorandum in support of its cross-motion asserted that "W&T is entitled to summary judgment on all counts as a matter of law." In addition, the memorandum further clarified the scope of the motion, stating that "Apache's position rests entirely upon its attempts to liberally expand the meaning of the term 'platform costs' as used in a 30-year-old Farmout Agreement."

Given these statements, Apache had ample notice and opportunity to object to the scope of relief prayed for in W&T's motion, but it did not do so. Unlike the cases cited by Apache, where the parties "were not on notice to present arguments," *Lozano v. Ocwen Federal Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007), W&T affirmatively requested dismissal of the complaint as a whole, and Apache had two opportunities over twenty-one days to respond. Accordingly, the district court properly entered a final judgment dismissing Apache's complaint with prejudice.

**D.**

W&T contends that it is "entitled to full immunity from Apache to the extent that the Farmout Agreement controls." The indemnity provision of the Farmout Agreement provides:

> In all operations hereunder you shall keep ARCO free and clear of, and indemnify them against, any loss or liability arising as a result of your operations involving said lease. The cost and risk of all operations conducted hereunder shall be solely yours and ARCO shall never be liable for any portion of the same.

This provision does not indemnify W&T for costs of litigation between the parties. Rather, as the district court correctly found, "the intent of the parties as evident from the text was to limit ARCO's liability for operations occurring on the lease. There is nothing in the text to suggest that ARCO was attempting to shift the costs of a subsequent litigation between the parties to the agreement." We therefore affirm the district court's partial denial of W&T's summary judgment on the indemnity ground.

13

No. 09-31122

## IV.

For the foregoing reasons, we AFFIRM the district court's final judgment granting, in part, W&T's cross-motion for summary judgment and dismissing Apache's complaint and W&T's cross-claim for indemnification and attorneys' fees with prejudice.